**Frankie Dean PAIR, Jr., Appellant,**

v.

**The STATE of Texas, State.**

**No. 2–04–494–CR.**

Court of Appeals of Texas, Fort Worth.

Jan. 5, 2006.

Tracey L. Jennings, Bowie, for Appellant.

Tim Cole, Dist. Atty., and Jack A. McGaughey, Asst. Dist. Atty., Montague, for the State of Texas.

PANEL F: DAUPHINOT, WALKER, and McCOY, JJ.

## OPINION

SUE WALKER, Justice.

### I. Introduction

Pursuant to a plea bargain, Appellant Frankie Dean Pair, Jr. pleaded guilty to the offense of manufacture of more than 400 grams of methamphetamine, and the trial court sentenced him to five years' confinement. In two points, Pair complains that the trial court erred by denying his pretrial motion to suppress. We will affirm.

### II. Factual Background[1]

Around 10:00 p.m. on February 28, 2003, deputies with the Montague County Sheriff's Department attempted to serve a felony arrest warrant on Kathy McWilliams in Sunset, Texas. Deputy Dwayne Schelsteder and two other deputies approached a single-story house and knocked on the front door, but no one answered. A strong odor of ether emanated from the interior of the house, and the deputies thought they heard something—a person or an animal—moving around inside of the residence. The deputies then walked around to the rear of the house and knocked on the back door; again, no one answered.

Concerned with the odor emanating from the house, one of the deputies contacted Deputy Dan Jordan, a lieutenant investigator for the sheriff's department. Deputy Jordan instructed the deputies to watch the house and make sure nobody left until he arrived. Deputy Jordan contacted Department of Public Safety Trooper Marshall Thomas and informed him that while attempting to serve an arrest warrant, deputies noticed a strong eitherlike odor commonly associated with methamphetamine coming from inside of the residence, that no one answered the door despite their repeated knocks, and that people were moving around inside. Another deputy had noticed "a pitcher of white powder on the back porch" that was thought to contain methamphetamine or methamphetamine by-products. Familiar with the residence because of information previously received that a methamphetamine lab possibly existed there, Trooper Thomas advised Deputy Jordan and the other officers to enter the residence in order to prevent the destruction of any possible evidence of drug activity. Trooper

---

1. The dissent provides a different view of the factual events and their timing, not viewing the historical facts in the light most favorable to the trial court's ruling.

Thomas further advised the deputies to remove the occupants from inside the house but to not perform a search of the premises.

Deputy Jordan arrived at the residence with additional officers and entered the house. Although deputies did not search the house, those persons discovered inside were taken outside, patted down for weapons, handcuffed, and placed in patrol cars. One individual was discovered in a bathroom pouring liquid into the toilet; officers detained him before he could flush the toilet. Pair was among those removed from the house.

Trooper Thomas obtained a search warrant in the meantime and arrived at the residence thereafter. Officers searched the residence and collected the white powder substance in the pitcher located on the back porch, the liquid from the toilet, and three syringes—one found in a kitchen drawer, one found in a coat on the couch, and another found on top of the oven—containing a clear liquid. Officers also found pseudoephedrine pills still in blister packets, clear liquid in an acetone container in the kitchen, and a baggie of white powder on top of the oven. Subsequent analysis of the seized items showed that the white powdery substance in the pitcher found on the back porch, two of the syringes, the clear liquid from the toilet, and the baggie holding white powder all contained methamphetamine.

In his motion to suppress evidence, Pair argued that both "the actions of the Texas Department of Public Safety Narcotics Service" and his warrantless arrest violated his rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article I, Section 9 of the Texas Constitution. Deputy Schelsteder and Trooper Thomas were the only two witnesses to testify at Pair's suppression hearing. The trial court signed an order denying Pair's motion to suppress on October 5, 2004; it made no findings of fact or conclusions of law. Pair appeals from this pretrial ruling.

### III. SEARCH, *STEELMAN*, AND ADMISSIBILITY OF EVIDENCE

In his first point, Pair argues that the trial court improperly denied his motion to suppress because he was illegally arrested. The State, however, maintains that the trial court correctly denied Pair's motion to suppress because the officers' initial entry and subsequent search of the residence was lawful.

### A. Standard of Review

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim.App.2000); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex.Crim.App.1997). In reviewing the trial court's decision, we do not engage in our own factual review. *Romero v. State*, 800 S.W.2d 539, 543 (Tex.Crim. App.1990); *Best v. State*, 118 S.W.3d 857, 861 (Tex.App.-Fort Worth 2003, no pet.). At a suppression hearing, the trial judge is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given to their testimony. *State v. Ross*, 32 S.W.3d 853, 855 (Tex.Crim.App. 2000). Therefore, we give almost total deference to the trial court's ruling on (1) questions of historical fact and (2) application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor. *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex.Crim.App.2002); *Best*, 118 S.W.3d at 861–62. However, we review de novo a trial court's rulings on mixed questions of law and fact if they do not turn on the credibility and demeanor of witnesses. *Johnson*, 68 S.W.3d at 652–53.

■ Where the trial court denies the motion and does not file findings of historical fact, as in this case, we view the evidence in the light most favorable to the trial court's ruling and assume that the ruling is based upon implicit findings of fact supported by the record. *Carmouche*, 10 S.W.3d at 327–28. Furthermore, we will uphold the trial judge's decision so long as it is correct under any theory of law. *Ross*, 32 S.W.3d at 855–56.

**B. Evidence Derived From Lawful Warrantless Entry and Subsequent Search Admissible Under Article 38.23(a)**

■ A non-consensual police entry into a residential unit constitutes a search under *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). *McNairy v. State*, 835 S.W.2d 101, 106 (Tex.Crim.App.1991). A warrantless search is justified when the State shows (1) that probable cause existed at the time the search was made and (2) that exigent circumstances existed which made the procuring of a warrant impracticable. *Estrada v. State*, 154 S.W.3d 604, 610 (Tex.Crim. App.2005); *McNairy*, 835 S.W.2d at 106. Probable cause to search a residence exists when reasonably trustworthy facts and circumstances within the knowledge of the officer on the scene would lead a man of reasonable prudence to believe that the instrumentality of a crime or evidence of a crime will be found. *McNairy*, 835 S.W.2d at 106. Exigent circumstances exist allowing a warrantless entry into a house when officers are justified in believing that evidence or contraband will be destroyed before they can obtain a search warrant. *Id.* at 107. Several factors are used in analyzing whether officers could have reasonably concluded that evidence would be destroyed or removed before they could obtain a search warrant: (1) the degree of urgency involved and the amount of time

necessary to obtain a warrant; (2) a reasonable belief that the contraband is about to be removed; (3) the possibility of danger to the officers guarding the site of the contraband while a search warrant is sought; (4) information indicating that the possessors of the contraband are aware that the police are on their trail; and (5) the ready destructibility of the contraband and knowledge that efforts to dispose of narcotics and to escape are characteristic behavior of persons engaged in the narcotics traffic. *Id.*

■ Applying the aforementioned principles to the instant case, testimony at the motion to suppress hearing showed that as Deputy Schelsteder stood at the front door he smelled a strong odor, which he believed to be ether, emanating from the house. Based on his knowledge and experience as a deputy, he recognized the odor as one commonly associated with the manufacture of methamphetamine. *See Estrada*, 154 S.W.3d at 608–09 ("Though it is clear that odor alone may not justify a *warrantless search*, ... [t]he 'odor of an illegal substance' may be a factor that police officers use in determining whether there is *probable cause* that an offense has been or is being committed.") (emphasis added). In addition to the odor, Deputy Schelsteder further testified that he thought he heard movement inside the house although he was not sure if it was a person or an animal. Trooper Thomas was in contact with Deputy Jordan. Trooper Thomas testified that he had previously conducted surveillance on the house because he had received information that a methamphetamine lab was possibly operating inside. He testified that Deputy Jordan informed him that "in addition to smelling the chemical odor, they [the deputies] could hear people inside the residence moving around, kind of like they were running, maybe trying to hide." Trooper

Thomas also learned from Deputy Jordan that a deputy on the scene had observed a "pitcher of a white powder on the back porch consisting of methamphetamine or by-products of methamphetamine." Viewing the evidence in the light most favorable to the trial court's ruling and considering the facts and circumstances available to the officers prior to the entry and considering the reasonable inferences that could be drawn from that information, we hold that probable cause existed to enter the residence. *McNairy*, 835 S.W.2d at 106.

■ Having determined that probable cause existed, we next examine the record to determine whether exigent circumstances existed to justify the warrantless entry. Deputies knocked on the front and back doors of the house, but no one answered; however, they thought they heard people moving around inside. Deputy Schelsteder testified that he and the other officers entered the residence "to make sure no evidence was destroyed." Indeed, Trooper Thomas testified that he "advised [Deputy] Jordan to ask officers to go ahead and make entry for officer safety to make sure that no one was injured and to prevent destruction of any other evidence in the residence." Trooper Thomas secured a search warrant in the meantime, and officers did not conduct a search of the residence until the search warrant arrived. Accordingly, we hold that exigent circumstances existed justifying entry into the house because a warrant could not be obtained immediately, because officers heard people moving around within the house, and because any contraband inside the residence—allegedly methamphetamine—was readily destructible. *See id.* at 107.

Pair argues that the trial court erred by denying his motion to suppress because his arrest was unlawful. Following his lead and citing *State v. Steelman,* 93 S.W.3d 102 (Tex.Crim.App.2002), the dissent concludes that "[b]ecause the police could not have lawfully arrested Appellant under any exception to the warrant requirement, 'they had no authority (under article 14.05) to enter the residence without a warrant and conduct a search, and any evidence seized as a result of those illegalities was tainted and subject to suppression.'" Thus, Pair and the dissent contend that the evidence gathered from the house should have been suppressed because Pair was illegally arrested under Texas Code of Criminal Procedure Article 14. We disagree for two reasons: first, the facts and thus applicable law of this case are distinguishable from those in *Steelman,* and second, the seized evidence is admissible pursuant to article 38.23(a) of the code of criminal procedure.

The dissent suggests that the facts of this case are "similar" to those in *Steelman,* and it proceeds to cite portions of that opinion at length. This case, however, is distinguishable in significant ways. First, the officers in *Steelman* entered the residence for the purpose of effecting a warrantless *arrest. Id.* at 104; *see also Parker v. State,* —— S.W.3d ——, ——, No. 07–02–0354–CR, 2005 WL 66942, at *2–3 (Tex.App.-Amarillo Jan.12, 2005, pet. granted) ("[T]he dispositive issue [in *Steelman* ] was whether probable cause existed to justify a warrantless arrest of Steelman in his home."); *Effler v. State,* 115 S.W.3d 696, 699 (Tex.App.-Eastland 2003, pet. ref'd) ("[T]he officers in *Steelman* entered the home for the purpose of effecting a warrantless arrest of its occupants."). The court stated,

Ian opened the door, stepped outside, and closed the door behind him. When Ian opened the door, the officers smelled the odor of burnt marijuana. The officers asked Ian for identification. Ian informed the officers that he would have

to retrieve his identification from inside the house. He then opened the door, walked back through it, and attempted to close it behind him. At that point, one of the officers placed his foot in the doorway and prevented Ian from closing the door. *The officers then burst through the doorway, handcuffed all of the occupants, including Leo, and placed them all under arrest.*

*At that point,* the officers contacted narcotics agent David Varner. Varner arrived at the scene and smelled marijuana inside the residence. After asking for, but not receiving, appellees' consent to search the residence, *Varner left to obtain a search warrant.*

*Steelman,* 93 S.W.3d at 104 (emphasis added). Here, officers did not (1) enter the residence in order to arrest the inhabitants because they smelled an odor commonly associated with the manufacture of methamphetamine and then (2) seek a warrant to search the residence. Rather, here officers entered the residence with probable cause for the purpose of preventing the destruction of contraband pending arrival of the search warrant. *See Estrada,* 154 S.W.3d at 608 ("Our holding in *Steelman* does not support the proposition that marijuana odors alone cannot constitute probable cause for a warrantless search. Rather, *Steelman* holds that the mere odor of marijuana does not constitute the probable cause necessary for police *to arrest someone* for committing an offense in their presence.") (emphasis added). Second, in *Steelman,* unlike in this case, there is no assertion or discussion of exigent circumstances necessitating the officers' entry into the residence. Thus, the *Steelman* facts are distinguishable from the facts of this case.

Moreover, Pair is appealing the trial court's denial of his motion to suppress illegally obtained evidence. Article 38.23(a) of the Texas Code of Criminal Procedure provides that evidence "obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America" shall not be admitted in evidence against the accused on the trial of any criminal case. TEX.CODE CRIM. PROC. ANN. art. 38.23(a) (Vernon 2005). As discussed above, a warrantless entry into a residence is a search. We determined that officers had probable cause to enter the residence and that exigent circumstances existed. Consequently, the warrantless entry was valid and justified. After entering the residence and removing those inside, officers did not proceed to conduct a search and seizure of items in the house. Rather, they postponed any further search until after a warrant had been acquired. After the search warrant arrived, the officers proceeded to search the residence and found the contraband that is at issue in the motion to suppress.

Throughout his appellate brief, Pair attempts to confuse the issues. He wants to prevent the evidence seized by officers from the residence, pursuant to a valid search warrant, from being used against him.[2] But he tries to achieve this by arguing a "warrantless arrest." This he cannot do. *See Steelman,* 93 S.W.3d at 123 (Hervey, J. dissenting).

Accordingly, we hold that the evidence Pair sought to suppress was not obtained in violation of article 38.23(a)—it was obtained pursuant to a valid search warrant after officers having probable cause entered the house to prevent the destruction of contraband. That Pair may have been illegally arrested—which we do not decide—has no effect upon and is of no con-

2. The items Pair seeks to suppress were found in the residence, not on Pair's person.

sequence to the subsequent lawful search of the residence, the seizure of contraband from the residence, and the admissibility of that evidence. *Johnson v. State,* 871 S.W.2d 744, 749–51 (Tex.Crim.App.1994) ("If the evidence is not 'obtained' in violation of the law, then its admission into evidence is not in contravention of Art. 38.23."). The trial judge's decision was correct under this theory of law. *See Ross,* 32 S.W.3d at 855–56. Therefore, the trial court did not err by denying Pair's motion to suppress evidence. We overrule Pair's first point.

## IV. SEARCH WARRANT VALIDITY

In his second point, Pair argues that the search warrant executed by the officers was invalid to authorize a search of the residence because the credibility of those individuals reporting information to the affiant cannot be determined, because part of the information relied on by the affiant is stale, and because the affidavit fails to name the deputies providing some of the information.

In determining whether a probable cause affidavit sufficiently supports a search warrant, the trial court examines the totality of the circumstances and gives great deference to the magistrate's decision to issue the warrant.[3] *Ramos v. State,* 934 S.W.2d 358, 362–63 (Tex.Crim.App.1996), *cert. denied,* 520 U.S. 1198, 117 S.Ct. 1556, 137 L.Ed.2d 704 (1997); *State v. Duncan,* 72 S.W.3d 803, 805 (Tex.App.-Fort Worth 2002, pet. dism'd). Probable cause exists when the magistrate has a substantial basis for concluding that a search would uncover evidence of wrongdoing. *Illinois v. Gates,* 462 U.S. 213, 236–37, 103 S.Ct. 2317, 2331, 76 L.Ed.2d 527 (1983). Although we examine only the four corners of the affidavit to determine whether probable cause exists, a magistrate may draw reasonable inferences from the affidavit and must interpret the affidavit in a common sense and realistic manner when determining whether probable cause exists to issue the warrant. *Ramos,* 934 S.W.2d at 362–63; *State v. Stone,* 137 S.W.3d 167, 175 (Tex. App.-Houston [1st Dist.] 2004, pet. ref'd); *Duncan,* 72 S.W.3d at 805–06.

The allegations in the affidavit are sufficient if they would "justify a conclusion that the object of the search is probably on the premises." *Ramos,* 934 S.W.2d at 363. While information from an unnamed informant alone does not establish probable cause, the informant's tip combined with independent police investigation may provide a substantial basis for the probable cause finding. *Janecka v. State,* 739 S.W.2d 813, 825 (Tex.Crim.App. 1987). A police officer is presumed to be reliable and no special showings are required. *Davis v. State,* 165 S.W.3d 393, 405 n. 3 (Tex.App.-Fort Worth 2005, pet. granted) (citing *United States v. Ventresca,* 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965)); *Barton v. State,* 962 S.W.2d 132, 143 (Tex.App.-Beaumont 1997, pet. ref'd).

---

3. The Supreme Court has expressed the probable cause standard as follows:

    [P]robable cause is the sum total of layers of information and the synthesis of what the police have heard, what they know, and what they observe as trained officers. We weigh not individual layers but the "laminated total ...[.]" In dealing with probable cause, ... as the very name implies, we are dealing with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.

    *McNairy,* 835 S.W.2d at 106 (quoting *Brinegar v. United States,* 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949)).

Probable cause ceases to exist when it is no longer reasonable to presume that items once located in a specified place are still there. *Stone*, 137 S.W.3d at 178. When the affidavit recites facts indicating activity of a protracted and continuous nature, the passage of time between the occurrence of events set out in the affidavit and the time the search warrant was issued becomes less significant. *Id.*

The affidavit, dated March 1, 2003, states that on October 17, 2002, Deputy Jordan advised Trooper Thomas, the affiant, that he had received information from a confidential informant that the occupants of 201 Campbell Street—the searched residence—were believed to be manufacturing methamphetamine. On December 15, 2002, Montague County deputies attempted to serve a warrant on a subject at the residence and smelled a strong odor of ether coming from about the residence. As the affidavit states, "The Deputies knew that ether is a known ingredient in the manufacture of Methamphetamine and the owner of the residence is associated with known drug dealers and users." The affidavit continues,

> On this date [the date the affidavit was executed—March 1, 2003], Deputies with the Montague County Sheriff's Office went to the residence in order to serve a felony arrest warrant on a subject who was reported to be inside. While at the residence, Deputies smelled a strong chemical odor that they know, due to their experience and training as law enforcement officers, to be associated with the Manufacture of Methamphetamine.

The information Trooper Thomas received from fellow officers is presumed credible. *See Barton*, 962 S.W.2d at 143. Moreover, the information supplied by the confidential informant does not stand on its own; it was corroborated by deputies just a few hours before the warrant was signed. Although a portion of the facts set out to establish probable cause relates information acquired in late 2002, the affidavit states that deputies attempting to serve an arrest warrant at the residence on February 28, 2003 once again smelled a chemical odor that they associated with the manufacture of methamphetamine. Thus, because the affidavit states facts indicating activity of a protracted and continuous nature, we give less significance to the passage of time between late 2002 and the day the warrant was signed and conclude that it was reasonable to assume that items located at the residence—methamphetamine—were still there. *See Stone*, 137 S.W.3d at 178. Finally, nothing in the Texas Code of Criminal Procedure requires the affidavit to provide the names of the officers supplying information. *See* TEX.CODE CRIM. PROC. ANN. art. 18.01(b), (c), (d) (Vernon Supp.2005). Accordingly, we overrule Pair's second point.[4]

## V. CONCLUSION

Having overruled both of Pair's points, we affirm the trial court's judgment.

DAUPHINOT, J. filed a dissenting opinion.

LEE ANN DAUPHINOT, Justice, dissenting.

. In two points, Appellant complains that the trial court erred by failing to suppress improperly seized evidence and that the search and arrest warrant, obtained and executed after the search, was invalid and did not attenuate the taint of illegality. Because I would hold that the trial court

---

4. The dissent raises issues that were not asserted by Pair in his brief. Having no discretion to consider unassigned error, we decline to entertain those lines of argument. *See Rezac v. State*, 782 S.W.2d 869, 870 (Tex. Crim.App.1990).

erred by failing to suppress the improperly seized evidence, that the search and arrest warrant was invalid, and that the warrant failed to attenuate the taint of the illegal search and seizure, I would reverse the trial court's judgment and remand the case to the trial court for a new trial without the improperly obtained evidence. I must therefore respectfully dissent from the majority's thoughtful opinion. Additionally, I must respectfully dissent from the majority's accusing Appellant of "attempt[ing] to confuse the issues." Appellant has an absolute right to challenge both the warrantless entry into the house and the validity of the warrant.

### RELEVANT FACTS

In the case before us, the evidence shows that Officers Schelsteder, White, and Gillespie went to the address on Campbell Street to serve an arrest warrant on Kathy McWilliams. They smelled ether. No one came to the door, although they heard either people or an animal moving inside. The record does not reflect that anyone left or attempted to leave the house with contraband. Nor was anyone seen attempting to destroy drugs. Indeed, no one saw any drugs inside the house.

Officers Gillespie and Schelsteder walked to the rear of the house. They knocked on the back door. No one responded. Officer Schelsteder contacted Officer Jordan. When Officer Jordan and some other officers arrived at the house, they entered the house without a warrant. Officer Schelsteder testified that they entered "[t]o secure in case any evidence could be—to make sure no evidence was destroyed." He denied searching the interior of the house but did admit to seizing the persons inside, handcuffing them, searching them, and putting them in squad cars.

Officer Jordan and other officers went back into town to get a warrant. After the warrant arrived, the officers searched the house.

Officer Thomas was a sergeant with the narcotics service of the Department of Public Safety ("DPS"). Officer Thomas had been conducting an investigation regarding a clandestine methamphetamine lab at the house. Officer Jordan contacted Officer Thomas. Officer Thomas claimed that Officer Jordan had told him that he had heard people inside the house trying to hide and that one person had come out to say that there was no one else in the house. Officer Thomas also claimed that before securing the warrant, "One deputy had seen a pitcher of a white powder on the back porch consisting of methamphetamine or by-products of methamphetamine." He did not explain who told him about the pitcher.

The record does not reflect that any officers other than Officers Schelsteder and Gillespie went to the back door before getting the warrant. Officer Schelsteder denied that either he or Officer Gillespie saw anything outside the back door before the warrant arrived:

> Q: Now, was anything noticed at that side of the house or outside of that door?
>
> A: No.

The affidavit and warrant are set out here in full:

### AFFIDAVIT

THE STATE OF TEXAS
COUNTY OF MONTAGUE
THE UNDERSIGNED AFFIANT, BEING A PEACE OFFICER UNDER THE LAWS OF TEXAS AND BEING DULY SWORN, ON OATH MAKES THE FOLLOWING STATEMENTS AND ACCUSATIONS.

1. THERE IS IN MONTAGUE COUNTY, TEXAS A SUSPECTED PLACE DESCRIBED AND LOCATED AS FOLLOWS:

A yellow single story, single family dwelling, located at 201 Campbell, also known as Route 1 Box 15D, in Sunset, Montague County, Texas. The residence is described as a yellow wood siding house with the front facing the North. The residence has a couch located in the front yard. The residence is located directly across from the "T" intersection of Willett and Campbell Road. The residence has a covered patio located in the front of it.

Said suspected place and premises, in addition to the foregoing description, also includes all other buildings, structures, places, and vehicles on said premises and within the curtilage, if said premises is a residence, that are found to be under the control of the suspected party named below and in, on, or around which suspected party may reasonably reposit or secrete property that is the object of the search requested herein.

2. SAID SUSPECTED PLACE IS IN CHARGE OF AND CONTROLLED BY EACH OF THE FOLLOWING NAMED PARTIES (HEREAFTER CALLED "SUSPECTED PARTY" WHETHER ONE OR MORE) TO WIT:

Frankie Dean Pair, Jr., a white male, date of birth 03/22/1975, Texas driver's license # [ . . . ];

Gregory Don Barnes, a white male, date of birth 02/26/1971, Texas driver's license # [ . . .;]

Melba LaVerne Lowrance, a white female, date of birth 08/26/1957, Texas driver's license # [ . . .;]

Laurie Kay Vanderhee, a white female, date of birth 07/09/1973, Texas driver's license # [ . . .;]

Stacie Lee Tackett, a white female, date of birth 11/07/1970, Texas driver's license # . . .

And others who are unknown to your affiant.

3. IT IS THE BELIEF OF AFFIANT, AND AFFIANT HEREBY CHARGES AND ACCUSES THAT SAID SUSPECTED PARTY HAS POSSESSION OF AND IS CONCEALING AT SAID SUSPECTED PLACE IN VIOLATION OF THE LAWS OF TEXAS THE FOLLOWING DESCRIBED PERSONAL PROPERTY, TO WIT:

a. books, records, sales and/or purchase invoices, receipts, notes, ledgers, bank records, money orders and/or other papers relating to the transportation, ordering, sale, manufacture, and distribution of illegal controlled substances and/or records relating to the receipt and/or disposition of the proceeds from the distribution of illegal controlled substances.

b. currency, financial instruments, precious metals, jewelry, and/or other items of value and/or proceeds of drug transactions and evidence of financial transactions relating to obtaining, transferring, laundering, secreting or spending large sums of money made from engaging in illegal controlled substance activities.

c. telephone or telephone recording devices, telephone and address books or papers which reflect names, addresses and/or telephone numbers of individuals associated in dealing or in the transportation of illegal controlled substances.

d. Computer hardware-Computer hardware consists of all equipment which can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data. Hardware includes (but is not limited to) any data

processing devices (such as central processing units, memory typewriters, and self-contained "laptop" or "notebook" computers); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, tape drives and tapes, optical storage devices, transistor-like binary devices, and other memory storage devices); peripheral input/output (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); and related communications devices (such as modems, cables and connections, recording equipment). RAM or ROM units, acoustic couplers, automatic dialers, speed dialers, programmable telephone dialing or signaling devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks).

Computer Software–Computer software is digital information, which can be interpreted by a computer and any of its related components to direct the way they work. Software is stored in electronic, magnetic, optical or other digital form. It commonly includes programs to run operating systems, applications (like word-processing, graphics, or spreadsheet programs), utilities, compilers, interpreters, and communication programs.

Computer Documentation–Computer related documentation consists of written, recorded, printed, or electronically stored material, which explains or illustrates how to configure or use computer hardware, software, or other related items.

Passwords and Data Security–Computer passwords and other data security devices are designed to restrict access to hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alphanumeric characters) usually operates as a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software or digital code may including programming code that creates "test" keys or "hot" keys which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

e. photographs of individuals, property and illegal controlled substance.

f. materials used in the packaging, cutting, weighing, transporting, and distributing illegal controlled substance.

g. surveillance devices such as outside/inside mounted video cameras, television monitors, police scanners, "body bug" detectors, night vision equipment, spotting scopes, binoculars, or any other devices used to detect the presence of law enforcement officers.

g.[sic] any controlled substances in violation of the Texas Health and Safety Code to include but limited to methamphetamine.

4. AFFIANT HAS PROBABLE CAUSE FOR THE SAID BELIEF BY REASON OF THE FOLLOWING FACTS, TO WIT:

A. Your Affiant, Marshall Thomas, is a commissioned peace officer under the laws of the State of Texas and has been employed by the Texas Department of Public Safety for over thirteen (13) years, and for the past five (12) months has been assigned to the Narcotics Service as a Sergeant/Investigator, stationed in Wichita Falls, Wichita County, Texas. Affiant has had training in the

investigation of narcotics violations, handling of informants, recognition of controlled substances, debriefing defendants, participant witnesses, and other persons who have personal knowledge of the amassing, spending, converting, transporting, distributing, laundering, and concealing of proceeds of narcotics trafficking.

B. The grounds for issuance of this warrant are derived from review of reports, surveillance, physical evidence, and discussions with investigators. Based on my experience and training I know the following:

1. Individuals who deal in illegal controlled substances maintain books, records, receipts, notes, ledgers, bank records, money orders and other papers relating to the manufacture, transportation, ordering, sale and distribution of illegal controlled substances;

2. Individuals who deal in illegal controlled substances routinely conceal in their residences caches of illegal controlled substances, large amounts of currency, financial instruments, precious metals, jewelry and other items of value and/or proceeds of illegal controlled substance transactions relating to obtaining, transferring, secreting or spending large sums of money from engaging in illegal controlled substances activities;

3. It is common for individuals who deal in illegal controlled substances to secrete contraband, proceeds of drug sales and records of drug transactions in secure locations within their residences and/or motor vehicles for ready access and to conceal such item[s] from law enforcement authorities;

4. Individuals who deal in illegal controlled substances profit from the sale of illegal controlled substances and they attempt to legitimize these profits. To accomplish these goals, these individuals utilize false and fictitious business records, foreign and domestic banks, securities, cashiers checks, money drafts, letters of credit, brokerage houses, real estate, shell corporations, and business fronts.

5. Individuals who deal in illegal controlled substances commonly maintain address or telephone numbers in books or papers which reflect names, addresses and/or telephone numbers for their associates in their illegal organization. In addition, these individuals utilize telephone systems to maintain contact with their associates in their illegal business. These telephones are often in the primary location of these individual's illegal businesses.

6. Individuals who deal in illegal controlled substances take or cause to be taken, photographs of themselves, their associates, their property and their illegal product. These individuals usually maintain these photographs in their possession or at their residences.

7. Individuals who deal in illegal controlled substances usually keep paraphernalia for packaging, cutting, weighing, and distributing illegal controlled substances. This paraphernalia includes scales, plastic bags, and cutting agents.

8. Individuals who deal in illegal controlled substances or individuals who reap substantial profits from providing the raw materials and equipment utilized in illegal conduct, commonly violate State and Federal laws by attempting to conceal the true amount and source of their income from the government.

C. Your affiant states that the facts which establish probable cause necessary for the issuance of a search warrant for the above described premises are based on the following facts:

On or about 10/17/2002, your affiant was advised by Montague County Ser-

geant Investigator Dan Jordan that he had received information from a confidential informant that the occupants that were residing at 201 Campbell in Sunset, Texas were believed to be manufacturing methamphetamine. The informant stated that the informant had smelled ether coming from the residence on more than one occasion and had seen several subjects that the informant knows to be associated with the manufacture of methamphetamine.

On about 12/15/02, Montague County Deputies Mark Robertson and Gary Studebaker went to the residence in order to serve a warrant on a subject. While at the front door, Deputies smelled a strong odor of ether coming from about the residence. The Deputies knew that ether is a known ingredient in the manufacture of Methamphetamine and the owner of the residence is associated with known drug dealers and users. The owner of the residence would not give consent to search the residence.

On this date, Deputies with the Montague County Sheriff's Office went to the residence in order to serve a felony arrest warrant on a subject who was reported to be inside. While at the residence, Deputies smelled a strong chemical odor that they know, due to their experience and training as law enforcement officers, to be associated with the Manufacture of Methamphetamine.

WHEREFORE, AFFIANT ASKS FOR ISSUANCE OF A WARRANT THAT WILL AUTHORIZE THE SEARCH OF SAID SUSPECTED PLACE FOR SAID PERSONAL PROPERTY AND SEIZE THE SAME AND TO ARREST EACH SAID SUSPECTED PARTY, AND TO TAKE CUSTODY OF ALL SEIZED PROPERTY AND SAFEK-EEP SUCH PROPERTY AS PROVIDED BY STATUTE.

The warrant itself provides,

### SEARCH WARRANT
THE STATE OF TEXAS
COUNTY OF MONTAGUE

THE STATE OF TEXAS to the Sheriff or any Peace Officer of Montague County, Texas or any Peace Officer of the State of Texas.

GREETING:

WHEREAS, the Affiant whose name appears on the attached affidavit is a Peace Officer under the laws of Texas and did heretofore this day subscribe and swear to said Affidavit before me (which said Affidavit is here now made part hereof for all purposes), and whereas I find that the verified facts stated by Affiant in said Affidavit show that Affiant has probable cause for the belief expressed therein and establish existence of proper grounds for Issuance of this Warrant; now, therefore, you are commanded to enter the suspected place described in said Affidavit an [sic] to there search for the personal property described in said Affidavit and to seize same and to arrest and bring before me each suspected party named in said Affidavit.

Further, you are ORDERED, pursuant to the provisions of Article 18.10, Texas Code of Criminal Procedure, to retain custody of any property seized pursuant to this Warrant, until further order of this Court or any other court of appropriate jurisdiction shall otherwise direct the manner of safekeeping of said property. This court grants you leave and authority to remove such seized property from this county, if and only if such removal is otherwise authorized by the provisions of Article 18.10, T.C.C.P. You are further ORDERED to give no-

tice to this Court, as a part of the inventory to be filled [sic] subsequent to the execution of this Warrant, and as required by Article 18.10, T.C.C.P. of the place where the property seized hereunder is kept, stored and held.

HEREIN FAIL NOT, but have you then and there this Warrant within three days, exclusive of the day of its issuance and exclusive of the day of its execution, with your return thereon, showing how you have executed the same, filed in this court.

ISSUED THIS THE 01st day of March, A.D., 2003, at 12:12 o'clock A.M. to certify which witness my hand this day.

Larry Sanders
MAGISTRATE

The affidavit provides that on October 17, 2002, the officers had received information from a confidential informant that the occupants residing at 201 Campbell in Sunset, Texas, were believed to be manufacturing methamphetamine. The informant stated that he had smelled ether coming from the residence on more than one occasion and had seen several persons whom the informant knew to be associated with the manufacture of methamphetamine. The record does not reflect the names of these persons, nor does it explain why the unnamed informant is worthy of belief.

On December 15, 2002, the affidavit further provides, Montague County Deputies Mark Robertson and Gary Studebaker went to the residence to serve a warrant on an unnamed subject. They smelled ether coming from the residence. The deputies knew that ether is a known ingredient in the manufacture of methamphetamine and that the owner of the residence was associated with known drug dealers and users. The owner of the residence,

however, is not named in the affidavit. Finally, the affidavit in support of the March 1 warrant was not signed until March 1, 2003, after the police had already entered the house and, as we discuss below, after they had already arrested Appellant.

The record does not reflect the presence of ether. After receiving the search warrant, the officers returned to the bathroom to retrieve liquid from the toilet. Clear liquid was also found in a syringe in a kitchen drawer and in another syringe located in a coat on the couch. Powdered methamphetamine was found in the kitchen inside a box with a syringe of clear liquid. More powdered methamphetamine was found on the back porch and in a coffee filter. The officers found pseudoephedrine still in blister packs on a counter in the living room and a clear liquid in an acetone bottle in a kitchen cabinet.

## LEGAL ANALYSIS

The issues in this case are the validity of law enforcement actions taken before the search and arrest warrant was obtained, that is, the initial entrance into the house and the detention and search of Appellant, the validity of the warrant, and the attenuation of the taint of any illegal arrest and search on the subsequent seizure of evidence after the warrant was obtained.

### The Warrantless Entry

Under state law, an officer may not enter a residence to make a warrantless arrest unless (1) the "arrest may be lawfully made without warrant," and (2)(a) a resident consents to the entry, or (b) there are exigent circumstances.[1] Before an appellate court can consider whether the officers had authority to enter the residence

1. TEX.CODE CRIM. PROC. ANN. art. 14.05 (Vernon 2005).

under Article 14.05, the court must first determine whether the initial arrest could be lawfully made without a warrant.[2] The officers in the case before us went to the house to execute a felony warrant on a woman who was not found at the house. The record is silent as to who owned or lived in the house. The record is also silent as to the nature of the offense for which the woman was to be arrested. Despite the contrary language of the affidavit, there is no indication that anyone refused permission for a consensual search.

The officers said that they smelled the odor of ether that they associated with a methamphetamine lab, but no ether was discovered at the scene. The record reflects that the methamphetamine lab in question involved the manufacture of crystal methamphetamine, which requires only three main ingredients: pseudoephedrine, iodine crystals, and red phosphorus.[3] That is, ether is not required to make crystal methamphetamine. The newer, small methamphetamine labs, unlike the older labs, are often impossible to detect by smell.[4]

Even if the officers smelled ether or, even if, contrary to the testimony of the officers on the scene, they did see the pitcher with methamphetamine outside on the back porch before entering the house, the mere presence of drugs or a drug precursor could not justify the warrantless entry. The pitcher does not provide the exigent circumstance to justify entering the house without a warrant. Nor is its existence listed in the warrant as an element of probable cause to believe drugs were inside the house. Certainly it created no justification to believe that anyone would destroy the methamphetamine in the pitcher outside the house if the officers did not immediately enter the house and seize those inside.

The officers and the majority contend that the warrantless entry was made to protect drugs from destruction. Yet, the officers only suspected that drugs might be present because they smelled ether, and, apparently, had smelled ether since October of the previous year. The only justification for their assuming that drugs would be destroyed was that they heard movement inside the house. Drugs, by their very nature, are almost always easily destroyed or consumed. To hold that the nature of drugs provides automatic exigent circumstances to justify a warrantless entry raises grave constitutional questions. This is especially true in light of the facts of the case now before this court.

The record makes clear that the only reason the officers believed that the drugs they suspected were inside the house would be destroyed or consumed was that the officers were surrounding the house and demanding that the door be opened. Police officers, however, may not themselves create the exigent circumstances. As the Supreme Court of the United States has held repeatedly, "Exigent circumstances, however, do not pass Fourth Amendment muster if the officers deliber-

2. *See id.* arts. 14.01–.05.

3. *See, e.g.,* Tex. Health & Safety Code Ann. § 481.124(b)(3)(B)(i) (Vernon Supp.2005); *Gregory v. State,* 159 S.W.3d 254, 258 (Tex. App.-Beaumont 2005, pet. ref'd); *Fulfer v. State,* 2005 WL 735012, at *2 (Tex.App.-El Paso Mar. 31, 2005, pet. ref'd) (not designated for publication).

4. *See, e.g.,* Marilyn Berlin Snell, *Welcome to Meth Country,* Sierra, Jan. 2001, at 50–54, *available at* http://www.sierra club.org/sierra/200101/Meth.asp; Mark Arax & Tom Gorman, *California's Illicit Farm Belt Export,* L.A. Times, Mar. 13, 1995, at A1, *available at* http://www.lucky town.org/tgotj/sc. txt.

ately create them."[5]  In the case now before this court, the officers had only to retreat, surreptitiously keeping the house under surveillance, until the warrant could be secured.  Of course they could only obtain a valid warrant if they had some basis for probable cause.

The majority's conclusion that the mere presence of drugs justifies a warrantless entry into a home has been rejected by the Supreme Court of the United States.[6] Texas case law dealing with no-knock warrants has also addressed the sufficiency of exigent circumstance evidence.  As our sister court in Houston has explained,

> Although the experienced officer may surmise that a party is likely to dispose of evidence when faced with the execution of the search warrant, such suspicions do not create an exigency to justify an unannounced entry.... To avail themselves of this exception to the knock-and-announce rule, officers must reasonably conclude that the resident has resolved to dispose of the evidence in the event of police intrusion.... The police should have at least some specific facts as to the case at hand that would justify their apprehension.... The mere fact that drugs are involved does not give the police probable cause to believe that evidence will be destroyed so as to justify an unannounced entry.[7]

The Texas Court of Criminal Appeals has also discussed the insufficiency of an odor to provide probable cause to justify a warrantless search,

This Court has recognized that "odors alone do not authorize a search without a warrant."  Why, then, did the officers burst into the house?  What offense, if any, did they observe Ian committing? The State argues that given the anonymous tip and the odor of burned marijuana, the officers had probable cause to believe an offense, possession of marijuana, had been committed in their presence.  We disagree.

First of all, a mere anonymous tip, standing alone, does not constitute probable cause.  In this case, the tip, that someone at the residence was dealing drugs, did not amount to anything.  The tip was never substantiated, and none of the occupants were ever charged with drug dealing.

Second, the mere odor of burning marijuana did not give the officers probable cause to believe that Ian had committed the offense of possession of marijuana in their presence.  The odor of marijuana, standing alone, does not authorize a warrantless search and seizure in a home.  An arresting officer must have specific knowledge to believe that the person to be arrested has committed the offense.  Professor LaFave explains:

> [T]he detection of the odor of marijuana in a certain place will not inevitably provide probable cause to arrest a person who is at that place.  Illustrative is *People v. Harshbarger*, where police, upon detecting the strong smell of burning marijuana in a house, arrested all four of the men found there-

**5.**  *United States v. Richard,* 994 F.2d 244, 247 (5th Cir.1993); *see also United States v. Webster,* 750 F.2d 307, 327 (5th Cir.1984), *cert. denied,* 471 U.S. 1106, 105 S.Ct. 2340, 85 L.Ed.2d 855 (1985).

**6.**  *Johnson v. United States,* 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948); *see also United States v. Howard,* 106 F.3d 70, 74 (5th Cir.1997) ("At the outset, we note that the presence of drugs alone does not give rise to exigent circumstances justifying a warrantless entry and search.").

**7.**  *Price v. State,* 93 S.W.3d 358, 368 (Tex.App.-Houston [14th Dist.] 2002, pet. ref'd) (op. on reh'g).

in, resulting in the discovery of amphetamines on the person of a guest. The court could "find no justification for defendant's arrest at the time it was made, nor for the search of his person occurring sometime subsequent thereto at the stationhouse. The officers had never seen or heard of defendant before. He was merely one of four persons sitting in the living room of a house in which the officers thought they smelled burning marijuana. They had no idea which one of them, or for that matter, if any of them had actually been smoking marijuana. Nor did defendant by his actions, furtive or otherwise, give any indication that he may have been violating the law. In effect, defendant's arrest was prompted by a mere suspicion that someone must have been smoking marijuana because of the odor believed to be present, and therefore, the best thing to do was arrest and search everybody."

W. LaFave, Search and Seizure § 3.6(b) (1996 & Supp.2002).[8]

If the mere presence of drugs without more will not justify an unannounced entry when a magistrate has issued a warrant authorizing entry, how much more offensive is entry without a warrant when the entry is justified only by the mere presence of drugs. "[T]he presence of drugs alone does not give rise to exigent circumstances justifying a warrantless entry and search."[9] "When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a

judicial officer, not by a policeman or government enforcement agent."[10]

Based on *Steelman* and article 14.05 of the Texas Code of Criminal Procedure, I would hold that Appellant could not have been lawfully arrested at the time of the officers' entry into the home. No probable cause supported the warrantless arrest.[11] Because the police could not have lawfully arrested Appellant at that time under any exception to the warrant requirement, "they had no authority (under article 14.05) to enter the residence without a warrant and conduct a search, and any evidence seized as a result of those illegalities was tainted and subject to suppression."[12]

The majority contends that the officers did not enter the house in order to arrest those inside, but, rather, to protect the alleged contraband. The officers knew there were persons or other live beings inside the house. They only suspected that there was contraband inside. The first thing the officers did was to seize and handcuff the persons inside the house. According to their own testimony, they did not search for or seize any evidence until after they obtained the warrant.

Even if there had been probable cause to believe that a crime was being committed, as the majority contends, probable cause is only half the equation. Probable cause is necessary to obtain a warrant.[13] Warrantless entry into a house is justified only if there are both articulable exigent circumstances (absent consent) and proba-

8. *State v. Steelman*, 93 S.W.3d 102, 108–09 (Tex.Crim.App.2002) *(footnotes and citations omitted)*.

9. *Howard*, 106 F.3d at 74.

10. *Johnson*, 333 U.S. at 14, 68 S.Ct. at 369.

11. *Johnson v. State*, 871 S.W.2d 744, 748 (Tex.Crim.App.1994).

12. *See Steelman*, 93 S.W.3d at 109.

13. Tex.Code Crim. Proc. Ann. art. 18.01(b) (Vernon 2005).

ble cause.[14] No amount of probable cause can justify a warrantless search where the State has not met its burden of showing exigent circumstances to the warrant requirement.[15]

The majority appears to contend that the general need to protect the alleged contraband provided exigent circumstances. But under the law of both the United States and Texas, the State failed to prove any specific, articulable exigent circumstances that would have justified the warrantless entry into the house. Nothing in the record tells us how long the odor of ether emanated from the house. The record does tell us that Officer Thomas had known of drug manufacturing in the house for an extended period of time. What created the emergency on the night in question? What additional probable cause arose? What exigency required the warrantless entry? The State showed no evidence to justify the search and seizure except the drugs found after entering the house. The officers did not consider the pitcher on the back porch to be threatened with destruction because they did not seize it or even notice it until after seizing the persons inside the house.

Even though Officer Thomas had been watching the house for some time and believed that drugs were being manufactured there, he sought no warrant until after the other officers forced their way into the house, handcuffed and searched the persons found there, put them into squad cars, walked through every room in the house, and observed those items in plain view, if the testimony of the officers on the scene is believed in its totality.

Because the State did not prove either probable cause or exigent circumstances but only the mere belief that drugs were present; I would hold the entry into the home unlawful. I must therefore respectfully dissent from the majority's opposite holding.

### The Warrantless Arrest

Appellant's detention was also unlawful. When the officers first entered the house, they seized Appellant and the other persons present in the house. One man was attempting to pour a clear liquid into the toilet when the officers seized him. Officer Schelsteder, who referred to Appellant and the other handcuffed persons as "prisoners" awaiting transport, nevertheless denied that they were under arrest. As Texas Code of Criminal Procedure article 15.22 provides,

A person is arrested when he has been actually placed under restraint or taken into custody by an officer or person executing a warrant of arrest, or by an officer or person arresting without a warrant.[16]

The Texas Court of Criminal Appeals has stated, "An arrest is complete whenever a person's liberty of movement is restricted or restrained."[17] Appellant was not free to leave, and the officers were waiting for the arrest warrant that they eventually relied on to justify the detention. I would hold that Appellant was under arrest when the officers handcuffed

**14.** *Estrada v. State,* 154 S.W.3d 604, 609 (Tex. Crim.App.2005).

**15.** *See, e.g., Coolidge v. New Hampshire,* 403 U.S. 443, 454–55, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564 (1971); *Vale v. Louisiana,* 399 U.S. 30, 34–35, 90 S.Ct. 1969, 1971–72, 26 L.Ed.2d 409 (1970); *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d

576 (1967); *Johnson,* 333 U.S. at 13–15, 68 S.Ct. at 369.

**16.** Tex.Code Crim. Proc. Ann. art. 15.22 (Vernon 2005).

**17.** *Medford v. State,* 13 S.W.3d 769, 773 (Tex. Crim.App.2000).

him and placed him in the police car. Officer Schelsteder denied that he saw Appellant commit a crime in his presence and admitted that the search of the suspects' persons uncovered neither weapons nor contraband. Because there was no legal basis for Appellant's arrest at that time, the arrest, like the entry into the home, was illegal.

The majority contends that Appellant does not challenge his seizure but only the search. I disagree. When the officers seized and handcuffed Appellant, they searched him. The search was a product of the seizure of his body. The officers went through the house and viewed various items in the house. All of these actions directly resulted from the unlawful, warrantless entry. The fact that the police used the fruits of the search of Appellant's person only to identify him in the search warrant makes no legal difference. The evidence was illegally obtained and should have been suppressed.

### Attenuation of the Taint

In determining whether the subsequently issued search and arrest warrant attenuated the taint of the unlawful entry and initial arrest, we should employ the *Brown* factors: [18]

1) whether *Miranda* warnings were given;

2) the temporal proximity of the [illegal] arrest and the [search and seizure];

3) the presence of intervening circumstances; and particularly,

4) the purpose and flagrancy of the official misconduct.[19]

Primary among the factors in this case is the lawfulness of the subsequently obtained warrant.[20] The Texas Court of Criminal Appeals has "recognized that even if an illegal warrantless arrest taints subsequently acquired evidence, such evidence need not be suppressed if the State can show that the taint has been attenuated (e.g., by an otherwise valid search warrant)." [21]

In this case, the subsequent warrant was a combination search and arrest warrant. Because the issue before this court is whether the subsequently-obtained warrant attenuated the taint of the warrantless entry and seizure of Appellant, we look beyond the four corners of the affidavit to resolve the attenuation issue.[22] But, because there are no *Franks*[23] allegations, we look only to the four corners of the affidavit to determine the secondary issue of the warrant's validity.[24]

The arrest portion of the warrant is flawed in substance and form. Article 15.02 of the Texas Code of Criminal Procedure sets out the requirements of a lawful arrest warrant.[25] This article provides that the warrant "must state that the person is accused of some offense against the laws of the State, naming the offense." [26]   Al-

18.  *Brown v. Illinois*, 422 U.S. 590, 603–04, 95 S.Ct. 2254, 2261–62, 45 L.Ed.2d 416 (1975).

19.  *Johnson*, 871 S.W.2d at 750–51.

20.  *Steelman*, 93 S.W.3d at 106–07; *Bell v. State*, 724 S.W.2d 780, 791 (Tex.Crim.App. 1986), *cert. denied*, 479 U.S. 1046, 107 S.Ct. 910, 93 L.Ed.2d 860 (1987).

21.  *Steelman*, 93 S.W.3d at 106–07; *see also Johnson*, 871 S.W.2d at 750–51.

22.  *See Johnson*, 871 S.W.2d at 750.

23.  *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

24.  *Ramsey v. State*, 579 S.W.2d 920, 921 (Tex. Crim.App. [Panel Op.] 1979).

25.  Tex.Code Crim. Proc. Ann. art. 15.02 (Vernon 2005).

26.  *Id.*

though the warrant incorporates the affidavit by reference, neither the warrant nor the supporting affidavit states that Appellant is accused of a specific offense against the laws of Texas.

The officers clearly used a form affidavit that contains multiple alternative allegations. The affiant chose to swear to all the alternatives. The closest the affiant gets to accusing Appellant of a specific offense against the laws of Texas is his allegation that

IT IS THE BELIEF OF AFFIANT, AND AFFIANT HEREBY CHARGES AND ACCUSES THAT SAID SUSPECTED PARTY HAS POSSESSION OF AND IS CONCEALING AT SAID SUSPECTED PLACE IN VIOLATION OF THE LAWS OF TEXAS THE FOLLOWING DESCRIBED PERSONAL PROPERTY, TO WIT: ...

g. surveillance devices such as outside/inside mounted video cameras, television monitors, police scanners, "body bug" detectors, night vision equipment, spotting scopes, binoculars, or any other devices used to detect the presence of law enforcement officers.

g.[sic] any controlled substances in violation of the Texas Health and Safety Code to include but limited to methamphetamine.

Additionally, there is insufficient evidence to show probable cause within the four corners of the affidavit. The evidence the affiant points to as "probable cause" for his belief that the enumerated items would be found inside the house is his training and experience; the fact that individuals who deal in illegal drugs have these items; his "review of reports, surveillance, physical evidence, and discussions with investigators"; and

On or about 10/17/2002, your affiant was advised by Montague County Sergeant Investigator Dan Jordan that he had received information from a confidential informant that the occupants that were residing at 201 Campbell in Sunset, Texas were believed to be manufacturing methamphetamine. The informant stated that the informant had smelled ether coming from the residence on more than one occasion and had seen several subjects that the informant knows to be associated with the manufacture of methamphetamine.

On about 12/15/02, Montague County Deputies Mark Robertson and Gary Studebaker went to the residence in order to serve a warrant on a subject. While at the front door, Deputies smelled a strong odor of ether coming from about the residence. The Deputies knew that ether is a known ingredient in the manufacture of Methamphetamine and the owner of the residence is associated with known drug dealers and users. The owner of the residence would not give consent to search the residence.

On this date, Deputies with the Montague County Sheriff's Office went to the residence in order to serve a felony arrest warrant on a subject who was reported to be inside. While at the residence, Deputies smelled a strong chemical odor that they know, due to their experience and training as law enforcement officers, to be associated with the Manufacture of Methamphetamine.

The Texas Court of Criminal Appeals has explained,

Probable cause to support the issuance of a search warrant exists where the facts submitted to the magistrate are sufficient to justify a conclusion that the object of the search is probably on the premises to be searched at the time the warrant is issued. Where facts and circumstances within the knowledge of a police officer, arising from a reasonably trustworthy source, would warrant a

man of reasonable caution in the belief that items of contraband or evidence of a crime may presently be found in a specified place, there is probable cause to issue a warrant to search that place. A search warrant affidavit must be read in a commonsense and realistic manner, and reasonable inferences may be drawn from the facts and circumstances contained within its four corners.[27]

There are several ways in which the portion of the warrant authorizing the search lacks a foundation of probable cause:

- Although the affidavit states that the suspect house is under the control of five persons, listing their names, dates of birth, and driver's license numbers, nothing in the record reflects any source of this information other than the discovery of the five people and the warrantless search of those persons when the police entered the residence without a warrant, that is, the affidavit necessarily depends on the illegally seized evidence.

- The warrant otherwise depends on stale, nonspecific information obtained from a confidential informant that does not tie Appellant to the evidence or to the ownership of the house. Nothing in the record shows why the unnamed informant is worthy of belief or any basis for or source of the informant's information.

- The record does not reflect who the owner of the Campbell Street residence was in October, December, or March.

- The record does not reflect that the persons in the residence on March 1, 2003, were the same people as those who were in the house in October or December 2002 or that they were associated with those people.

- The record does not reflect the age of the odor of ether or chemicals—that is, whether the odor lingered from earlier activities, especially in light of the fact that no chemicals were found in the house that could have produced the odor of ether. As for the allegation that officers smelled a chemical odor associated with the manufacture of methamphetamine, testimony revealed that this chemical odor was that of ether. Yet this same odor was reported in October and in December. That is, it was reported over a period of more than four months.

- The affidavit refers to surveillance, yet the record reflects no surveillance. Nothing in the record reflects any attempt to verify the tips or to learn the identity or identities of any owner or occupant of the house. The record does not reflect that before the illegal entry, anyone searched the trash for evidence of the manufacture of methamphetamine, made a buy, entered the house and saw evidence of contraband, or watched traffic to and from the house. Indeed, the first confirmation of the existence of contraband or drug paraphernalia occurred when the officers entered the house.

- Again, the affidavit in support of the warrant was not signed until March 1, 2003, after the illegal arrest and illegal entry.

In summary, the original warrantless entry into the house was unlawful, as was the seizure of Appellant. The subsequent warrant did nothing to attenuate the taint because the affidavit did not provide probable cause for the issuance of the warrant without information obtained during the

---

27. *Cassias v. State,* 719 S.W.2d 585, 587–88    (Tex.Crim.App.1986).

original unlawful entry. That is, the warrant was not valid. The majority concedes that probable cause ceases to exist when it is no longer reasonable to presume that items once located in a specified place are still there. Nothing in the affidavit and nothing in the record suggests that the persons and objects inside the house on March 1, 2003, were the same persons and objects that were inside the house in October and December 2002. The affidavit does not state that the affiant checked any records to determine who lived in the house in October, December, or March. The confidential informant either did not name the persons or Officer Thomas omitted the names from that portion of the affidavit. Nothing in the affidavit provides any information about what was going on in the house on March 1, 2003, beyond the smell of ether and the information obtained in the warrantless entry. None of the information provided by the unnamed informant was corroborated by Officer Thomas. We have no idea why the information should be considered credible. Additionally, it should be noted that the affidavit contains no reference to the pitcher of methamphetamine found on the porch, and the officers on the scene denied seeing it until after they obtained the warrant.

The other factors similarly did nothing to attenuate the taint. There is no evidence in the record that Appellant was *Mirandized*.[28] Additionally, while the time period between the initial arrest and entry and the search and seizure authorized by the warrant exceeded two hours, nothing happened during that time to attenuate the taint; law enforcement guarded the house and its occupants during the entire period. Finally, the officers' misconduct here does not appear to be accidental or perchance; it pervades the entire episode. I would hold that the warrant should not

have issued on the basis of the affidavit because it was inadequate as a matter of law and relied on the fruits of the warrantless entry. I would therefore hold that the taint of the illegal arrest and entry was not attenuated. Consequently, I would hold that the trial court erred by denying Appellant's motion to suppress. For all of the above reasons, I must respectfully dissent from the majority opinion.

---

**28.** *See Miranda v. Arizona,* 384 U.S. 436, 86     S.Ct. 1602, 16 L.Ed.2d 694 (1966).