In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-07-00088-CR


______________________________




DONALD RAY JONES, Appellant



V.



THE STATE OF TEXAS, Appellee




 


On Appeal from the 6th Judicial District Court


Lamar County, Texas


Trial Court No. 21531




 




Before Morriss, C.J., Carter and Moseley, JJ.


Opinion by Justice Moseley



O P I N I O N



 Donald Ray Jones appeals his conviction by a Lamar County jury of aggravated assault with
a deadly weapon and the resulting sentence assessed at thirty years' confinement. 

 Toward the end of Jones's stormy seven-year marriage to Theresa Davis, (1) Davis had been
visiting at her niece's house, drinking beer and celebrating a child's birthday. Davis then elicited a
ride from her mother and, upon arriving at the house which she shared with Jones, she discovered
the front door locked. After she knocked loudly, either Jones opened the door to allow her to enter
or she entered the house through another door. The story line diverges between two versions at this
point. 

 In the version related by the victim, Davis maintained that Jones called her while she was at
her niece's house, rudely instructing Davis to immediately return home. After she entered the house
and put down her belongings, she asked Jones why he had told her to "Bring [my] ass home,"
whereupon Jones picked up a walking cane (about as big around as a half dollar and three to four feet
in length) and attacked her with it, striking her with the cane between ten and twenty times. The
beating ceased when Davis informed Jones that her mother remained outside the house in her car;
when Jones went to determine the truth of the statement, Davis ran from the house. Shortly after
Davis left the house, Jones ran to his truck, entered it, and sped from the premises. Davis maintained
that she had no knife during this incident. Davis had to seek medical treatment for the wounds she
suffered.

 Jones's account of the encounter was quite different. He testified that Davis had been very
drunk the evening before the incident and that he had called Davis's niece the afternoon of the
incident to leave word for Davis not to come home if she was intoxicated. When Davis entered the
house, she was carrying a beer and acting belligerent. She put down the beer she was carrying and
came at him with a knife, cutting his finger. Jones then grabbed the cane and struck Davis repeatedly
with it until she dropped the knife. Davis grabbed the cane Jones was still holding and they
struggled over it; during this struggle, Jones let go of the cane, causing Davis to fall backward,
striking her head on a stove. Jones then hurriedly left the house and went to the residence of his
aunt, Betty Jones.

 The common threads between the two stories are that Davis entered the house, Jones and
Davis argued, and Jones repeatedly struck Davis with the cane. The incident came to a conclusion
with Jones rapidly leaving the house, getting into his truck, and leaving. 

 The State was allowed to introduce evidence of two prior circumstances in which Jones had
subjected Davis to physical violence. On one prior occasion in 1999, Jones had struck Davis in the
mouth, causing a split lip which needed to be sutured; on another occasion in 2004, Jones had
choked Davis. On the first occasion, no criminal charges were filed, but Jones was convicted of
family violence assault in 2004. 

 Jones raises two points of error in his appeal: (1) he complains of the actions of the trial
court in allowing the admission of evidence of the two alleged prior assaults of Davis by Jones, and
(2) he excepts to the refusal of the trial court to submit the issue of the lesser-included offense of
simple assault to the jury. 

EVIDENCE OF PRIOR BAD ACTS 

 Jones complains that the trial court erred in allowing evidence of two prior assaults of Davis
by Jones. 

 Jones correctly points out that Rule 404(b) provides that, "Evidence of other crimes, wrongs
or acts is not admissible to prove the character of a person in order to show action in conformity
therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity,
intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . ." See Tex. R.
Evid. 404(b). 

 Jones makes the assertion in his brief that his case is substantially similar to and legally
indistinguishable from Hilliard v. State, 881 S.W.2d 917 (Tex. App.--Fort Worth 1994, no pet.),
but the two cases are easily distinguishable. In Hilliard, there was no question of self-defense raised
by the accused; in this case, there was--the existence of a claim of self-defense is determinative
here.

 In his opening statement, Jones provided a portion of his rendition of the incident and his
version of the reason for physical violence. In that opening statement, Jones said, "The thing is, Mrs.
Jones (2) started this by grabbing the knife and trying to cut Mr. Jones so it is a case of self-defense. 
You have a right to protect yourself and we are going to ask you to find that." 

 It is well settled that when an accused claims self-defense, the State, in order to show the
accused's intent, may introduce rebuttal evidence of prior violent acts by the accused in order to show
the intent of the person claiming self-defense. Halliburton v. State, 528 S.W.2d 216, 218-19 (Tex.
Crim. App. 1975); Johnson v. State, 963 S.W.2d 140, 144 (Tex. App.--Texarkana 1998, pet. ref'd);
Armstrong v. State, 850 S.W.2d 230, 236 (Tex. App.--Texarkana 1993), aff'd, 897 S.W.2d 361
(Tex. Crim. App. 1995). Evidence of prior violent acts also may be admissible to refute a defensive
theory. See Halliburton, 528 S.W.2d at 218; Albrecht v. State, 486 S.W.2d 97, 101 (Tex. Crim. App.
1972); Morrow v. State, 735 S.W.2d 907, 909 (Tex. App.--Houston [14th Dist.] 1987, pet. ref'd). 
"Extraneous-offense evidence is not inadmissible under Rule 404(b) when it is offered to rebut an
affirmative defense or a defensive issue that negates one of the elements of the crime." Casey v.
State, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007). 

 In some circumstances, positions or defenses first posited during an opening statement are
subject to impeachment. Powell v. State, 63 S.W.3d 435, 439 (Tex. Crim. App. 2001). In this
circumstance, wherein Jones plainly stated in his opening argument that he was to rely on a claim
of self-defense in the altercation which occurred between him and Davis, Jones opened the door for
the State to show other incidents wherein Jones had visited violence on Davis. In introducing
evidence of prior assaults by Jones on Davis, the State did nothing more than rebut the defense which
had been raised by Jones in the opening statement.

 This point of error is overruled.

REFUSAL TO INCLUDE CHARGE OF LESSER-INCLUDED OFFENSE

 Jones next complains of the refusal of the trial court to instruct the jury that it could find
Jones guilty of the lesser-included offense of assault rather than the aggravated assault with which
he was indicted.

 In Texas, the answers to questions about lesser-included offenses must be based on Article
37.09 of the Texas Code of Criminal Procedure, which states:

 An offense is a lesser included offense if:

 

 (1) it is established by proof of the same or less than all the facts required to
establish the commission of the offense charged;

 

 (2) it differs from the offense charged only in the respect that a less serious
injury or risk of injury to the same person, property, or public interest suffices to
establish its commission;

 

 (3) it differs from the offense charged only in the respect that a less culpable
mental state suffices to establish its commission; or

 

 (4) it consists of an attempt to commit the offense charged or an otherwise
included offense.


Tex. Code Crim. Proc. Ann. art. 37.09 (Vernon 2006).

 However, the courts in Texas have struggled through the years regarding the proper
application of the issue of lesser-included offenses. The problem in its application to practice deals
with the definition in Article 37.09(1) of the term "facts required to establish."

 Within the last year, the Texas Court of Criminal Appeals made a detailed review of the issue
regarding the application of the lesser-included offense issue and determined that Texas follows the
"cognate-pleadings" approach to analysis concerning it. Hall v. State, 225 S.W.3d 524 (Tex. Crim.
App. 2007). This approach is one "in which the court looks to the facts and elements as alleged in
the charging instrument, and not just to the statutory elements of the offense, to determine whether
there exists a lesser-included offense of the greater charged offense." (3) Id. at 526. 

 In Hall, the court returned to a two-step analysis discussed in the opinion issued on the
original hearing of Day v. State, 532 S.W.2d 302 (Tex. Crim. App. 1976), criticizing the opinion
issued on rehearing. In Hall, the court now says that the first step on appellate review is to ascertain
whether there is, indeed, a lesser-included offense by comparing the elements of the greater offense
and the lesser offense as contained in the charging document without any reference to the facts or
evidence of the particular case. The second step comes only after the first determination is answered
positively. That step is to conduct an inquiry concerning whether there was sufficient evidence at
trial to have required the court to submit to the jury the issue of the lesser-included offense. 

 A person commits assault if the person "intentionally, knowingly, or recklessly causes bodily
injury to another." See Tex. Penal Code Ann. § 22.01(a) (Vernon Supp. 2007). Assault becomes
the offense of aggravated assault when one of the following two circumstances is present: 1) the
assault causes serious bodily injury, or 2) the actor uses or exhibits a deadly weapon. See Tex.
Penal Code Ann. § 22.02 (Vernon Supp. 2007); Landry v. State, 227 S.W.3d 380 (Tex.
App.--Texarkana 2007, pet. filed). The added factor of either the infliction of "serious" bodily
injury or the employment of a deadly weapon in the assault is the potential element which magnifies
the crime from assault (a misdemeanor) to aggravated assault (a felony).

 Using the two-part test of Day as explained in Hall, we now first look at the indictment under
which Jones was charged by the State. It shows that Jones was charged with having "intentionally
or knowingly cause[d] bodily injury to Theresa Jones by hitting her with a cane or walking stick and
the defendant did use or exhibit a deadly weapon during the commission of the assault, to-wit: a
cane or walking stick." There are two elements here, one of which involved the infliction of bodily
injury to another person, an act proscribed by Section 22.01 of the Texas Penal Code, this element
being coupled with the use of a deadly weapon as mentioned in Section 22.02 of the Texas Penal
Code. See Tex. Penal Code Ann. §§ 22.01, 22.02. The predicatory inclusion of simple assault
within the description of aggravated assault would tend to show the inclusion of simple assault as
a lesser-included offense of aggravated assault.

 Following through with the second prong of the Hall test, we then look at the evidence at the
time of trial. 

 Section 1.07(a)(17)(B) of the Texas Penal Code defines a "deadly weapon" to include:
"anything that in the manner of its use or intended use is capable of causing death or serious bodily
injury." Tex. Penal Code Ann. § 1.07(a)(17)(B) (Vernon Supp. 2007). Detective Jeff Springer
with the Paris Police Department testified that a walking cane which is between three to four feet in
length and a half dollar in diameter (such as the one which Davis described as having been used by
Jones to beat her) used by an adult male to strike an adult female would meet the definition of a
deadly weapon. Jones admitted to having struck Davis with the cane (albeit maintaining that this
was prompted by his desire to defend himself from her attack) and offered no rebuttal to the evidence
of the deadly weapon nature of the cane which was used in the beating.

 "This [second] prong of the test requires that the record contain some evidence 'that would
permit a jury rationally to find that if the defendant is guilty, he is guilty only of the lesser offense.'" 
Enriquez v. State, 21 S.W.3d 277, 278 (Tex. Crim. App. 2000) (quoting Skinner v. State, 956 S.W.2d
532, 543 (Tex. Crim. App.1997)). The evidence must establish the lesser-included offense as a valid
rational alternative to the charged offense. Wesbrook v. State, 29 S.W.3d 103, 113 (Tex. Crim. App.
2000). "[I]n determining whether the second prong has been met, it is not enough that the jury may
disbelieve crucial evidence pertaining to the greater offense, but rather, there must be some evidence
directly germane to the lesser-included offense for the finder of fact to consider before an instruction
on a lesser-included offense is warranted." Hampton v. State, 109 S.W.3d 437, 441 (Tex. Crim.
App. 2003). 

 The evidence is uncontroverted that Jones struck Davis repeatedly with a cane and that the
cane (when used in the fashion Jones employed it) met the definition of a "deadly weapon." There
was neither evidence adduced at any time that Jones did not strike Davis with the cane, nor was there
any evidence presented that the cane was not a deadly weapon. The only real defense which Jones
presented was that he struck Davis with the cane as an act of self-defense. Therefore, there was no
germane evidence presented for the jury to rationally consider that the lesser-included offense of
simple assault took place; under the evidence presented, if the jury found that any assault occurred
at all, it was an aggravated assault. Jones's assertion that he was entitled to the inclusion of a lesser-included offense jury charge fails to satisfy the second prong of the Hall test. Accordingly, we
overrule this point of appeal.

 We affirm the judgment.




 Bailey C. Moseley

 Justice


Date Submitted: November 30, 2007

Date Decided: December 5, 2007


Publish
1. At the time of the incident giving rise to the offense with which Jones was charged, the
victim was then named Theresa Jones. They were divorced before the trial of this case and the
victim resumed her former name of Theresa Ann Davis. We use "Davis" as the name of the victim
rather than "Jones," the name used in the indictment.
2. Referring to Davis.
3. The other cognate approach is known as the "cognate-evidence" approach, a more liberal
approach in which the court first looks at the facts adduced at trial in its lesser-included offense
analysis.



;
 font-family:"Times New Roman","serif";
 mso-fareast-font-family:Calibri;
 mso-fareast-theme-font:minor-latin;}
p.MsoHeader, li.MsoHeader, div.MsoHeader
 {mso-style-priority:99;
 mso-style-link:"Header Char";
 margin:0in;
 margin-bottom:.0001pt;
 text-align:justify;
 text-justify:inter-ideograph;
 mso-pagination:widow-orphan;
 tab-stops:center 3.25in right 6.5in;
 font-size:12.0pt;
 font-family:"Times New Roman","serif";
 mso-fareast-font-family:Calibri;
 mso-fareast-theme-font:minor-latin;}
p.MsoFooter, li.MsoFooter, div.MsoFooter
 {mso-style-priority:99;
 mso-style-link:"Footer Char";
 margin:0in;
 margin-bottom:.0001pt;
 text-align:justify;
 text-justify:inter-ideograph;
 mso-pagination:widow-orphan;
 tab-stops:center 3.25in right 6.5in;
 font-size:12.0pt;
 font-family:"Times New Roman","serif";
 mso-fareast-font-family:Calibri;
 mso-fareast-theme-font:minor-latin;}
p.MsoAcetate, li.MsoAcetate, div.MsoAcetate
 {mso-style-noshow:yes;
 mso-style-priority:99;
 mso-style-link:"Balloon Text Char";
 margin:0in;
 margin-bottom:.0001pt;
 mso-pagination:none;
 mso-layout-grid-align:none;
 text-autospace:none;
 font-size:8.0pt;
 font-family:"Tahoma","sans-serif";
 mso-fareast-font-family:"Times New Roman";
 mso-fareast-theme-font:minor-fareast;}
span.BalloonTextChar
 {mso-style-name:"Balloon Text Char";
 mso-style-noshow:yes;
 mso-style-priority:99;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Balloon Text";
 mso-ansi-font-size:8.0pt;
 mso-bidi-font-size:8.0pt;
 font-family:"Tahoma","sans-serif";
 mso-ascii-font-family:Tahoma;
 mso-hansi-font-family:Tahoma;
 mso-bidi-font-family:Tahoma;}
span.HeaderChar
 {mso-style-name:"Header Char";
 mso-style-priority:99;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:Header;
 mso-ansi-font-size:12.0pt;
 mso-bidi-font-size:12.0pt;
 font-family:"Times New Roman","serif";
 mso-ascii-font-family:"Times New Roman";
 mso-fareast-font-family:Calibri;
 mso-fareast-theme-font:minor-latin;
 mso-hansi-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";}
span.FooterChar
 {mso-style-name:"Footer Char";
 mso-style-priority:99;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:Footer;
 mso-ansi-font-size:12.0pt;
 mso-bidi-font-size:12.0pt;
 font-family:"Times New Roman","serif";
 mso-ascii-font-family:"Times New Roman";
 mso-fareast-font-family:Calibri;
 mso-fareast-theme-font:minor-latin;
 mso-hansi-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";}
span.FootnoteTextChar
 {mso-style-name:"Footnote Text Char";
 mso-style-noshow:yes;
 mso-style-priority:99;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Footnote Text";
 mso-ansi-font-size:10.0pt;
 mso-bidi-font-size:10.0pt;
 font-family:"Times New Roman","serif";
 mso-ascii-font-family:"Times New Roman";
 mso-fareast-font-family:Calibri;
 mso-fareast-theme-font:minor-latin;
 mso-hansi-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";}
.MsoChpDefault
 {mso-style-type:export-only;
 mso-default-props:yes;
 mso-ascii-font-family:Calibri;
 mso-ascii-theme-font:minor-latin;
 mso-fareast-font-family:"Times New Roman";
 mso-fareast-theme-font:minor-fareast;
 mso-hansi-font-family:Calibri;
 mso-hansi-theme-font:minor-latin;
 mso-bidi-font-family:"Times New Roman";
 mso-bidi-theme-font:minor-bidi;}
.MsoPapDefault
 {mso-style-type:export-only;
 margin-bottom:10.0pt;
 line-height:115%;}
 /* Page Definitions */
 @page
 {mso-page-border-surround-header:no;
 mso-page-border-surround-footer:no;
 mso-footnote-separator:url("6-10-199-CR%20Burton%20v.%20State%20FINAL%20mtd_files/header.htm") fs;
 mso-footnote-continuation-separator:url("6-10-199-CR%20Burton%20v.%20State%20FINAL%20mtd_files/header.htm") fcs;
 mso-endnote-separator:url("6-10-199-CR%20Burton%20v.%20State%20FINAL%20mtd_files/header.htm") es;
 mso-endnote-continuation-separator:url("6-10-199-CR%20Burton%20v.%20State%20FINAL%20mtd_files/header.htm") ecs;}
@page WordSection1
 {size:8.5in 11.0in;
 margin:1.0in 1.0in 1.0in 1.0in;
 mso-header-margin:1.0in;
 mso-footer-margin:1.0in;
 mso-even-header:url("6-10-199-CR%20Burton%20v.%20State%20FINAL%20mtd_files/header.htm") eh1;
 mso-header:url("6-10-199-CR%20Burton%20v.%20State%20FINAL%20mtd_files/header.htm") h1;
 mso-even-footer:url("6-10-199-CR%20Burton%20v.%20State%20FINAL%20mtd_files/header.htm") ef1;
 mso-footer:url("6-10-199-CR%20Burton%20v.%20State%20FINAL%20mtd_files/header.htm") f1;
 mso-first-header:url("6-10-199-CR%20Burton%20v.%20State%20FINAL%20mtd_files/header.htm") fh1;
 mso-first-footer:url("6-10-199-CR%20Burton%20v.%20State%20FINAL%20mtd_files/header.htm") ff1;
 mso-paper-source:0;}
div.WordSection1
 {page:WordSection1;}
@page WordSection2
 {size:8.5in 11.0in;
 margin:1.7in 1.0in .6in 1.0in;
 mso-header-margin:2.0in;
 mso-footer-margin:1.0in;
 mso-even-header:url("6-10-199-CR%20Burton%20v.%20State%20FINAL%20mtd_files/header.htm") eh1;
 mso-header:url("6-10-199-CR%20Burton%20v.%20State%20FINAL%20mtd_files/header.htm") h1;
 mso-even-footer:url("6-10-199-CR%20Burton%20v.%20State%20FINAL%20mtd_files/header.htm") ef1;
 mso-footer:url("6-10-199-CR%20Burton%20v.%20State%20FINAL%20mtd_files/header.htm") f2;
 mso-first-header:url("6-10-199-CR%20Burton%20v.%20State%20FINAL%20mtd_files/header.htm") fh1;
 mso-first-footer:url("6-10-199-CR%20Burton%20v.%20State%20FINAL%20mtd_files/header.htm") ff1;
 mso-paper-source:0;}
div.WordSection2
 {page:WordSection2;}
-->











 
 
 
 
 
 
 




 

 

 

 

 

 

 

 

 

                                                         In
The

                                                Court
of Appeals

                        Sixth
Appellate District of Texas at Texarkana

 

                                                ______________________________

 

                                                             No. 06-10-00199-CR

                                                ______________________________

 

 

                                  JAMES SUNNY BURTON,
Appellant

 

                                                                V.

 

                                     THE STATE OF TEXAS, Appellee

 

 

                                                                                                  


 

 

                                       On Appeal from the 354th
Judicial District Court

                                                              Hunt County, Texas

                                                            Trial
Court No. 25,928

 

                                                          
                                        

 

 

 

                                          Before Morriss, C.J.,
Carter and Moseley, JJ.

                                                        Opinion by Justice Moseley








                                                                   O P I N I O N

 

            James
Sunny Burton, having been charged with possession of less than one gram of
methamphetamine, filed a motion to suppress evidence, claiming an unlawful
search.  The trial court denied
suppression of the evidence.  After a
jury was empaneled, Burton announced that he would waive his right to a jury
trial.  The State did not acquiesce and
Burton entered a plea of guilty to the offense, the evidence was stipulated,
and Burton was found guilty by the jury. 
Submitting the issue of punishment to the court, he was sentenced to two
years confinement.[1]

            On
appeal, Burton challenges the trial courts denial of Burtons motion to
suppress.  The State maintains that Burton
waived his right to appeal, contending that he had to make his plea of guilty
conditional upon his right to appeal.  

            Before
addressing Burtons complaint on appeal, we will discuss the States contention
that Burton waived his right to appeal his conviction.[2] 

Waiver of Right to Appeal?

            In
its contention that Burton has waived his right to appeal, the State cites Shallhorn v. State, 732 S.W.2d 636 (Tex.
Crim. App. 1987).  The result in Shallhorn turned in large part on Helms v. State, 484 S.W.2d 925 (Tex.
Crim. App. 1972), which was modified by Young
v. State, 8 S.W.3d 656, 66667 (Tex. Crim. App. 2000) (a valid guilty
plea does not waive defendants right to appeal unless judgment of guilt
rendered independently of error asserted). 
In a case such as Burtons, where the evidence sought to be suppressed
was drugs and other contraband, the judgment of guilt is not independent of the
trial courts ruling on the suppression motion. 
Young, 8 S.W.3d at 667; Hargrove v. State, 40 S.W.3d 556, 55859
(Tex. App.Houston [14th Dist.] 2001, pet. refd).

            A
defendant in Texas has a statutory right to appeal his conviction:

A defendant in any criminal action has the right
of appeal under the rules hereinafter prescribed, provided, however, before the
defendant who has been convicted upon either his plea of guilty or plea of nolo
contendere before the court and the court, upon the election of the defendant,
assesses punishment and the punishment does not exceed the punishment
recommended by the prosecutor and agreed to by the defendant and his attorney may
prosecute his appeal, he must have permission of the trial court, except on
those matters which have been raised by written motion filed prior to trial.  This article in no way affects appeals
pursuant to Article 44.17 of this chapter.

 

Tex.
Code Crim. Proc. Ann. art. 44.02 (Vernon 2006); see also Ex parte Broadway,
301 S.W.3d 694, 697 (Tex. Crim. App. 2009). 
A defendant may, however, waive this right, if the waiver is executed
voluntarily, knowingly, and intelligently. 
Broadway, 301 S.W.3d at 697 (citing
Tex. Code Crim. Proc. Ann. art.
1.14; Monreal v. State, 99 S.W.3d
615, 617 (Tex. Crim. App. 2003)).  Where
a waiver of appeal is entered prior to adjudication and sentencing, has not
been bargained for, and the precise terms of punishment are uncertain, the
waiver is not made voluntarily, knowingly, and intelligently.  Ex
parte Delaney, 207 S.W.3d 794, 79697 (Tex. Crim. App. 2006).[3]  Nevertheless, if some form of bargain is made
between the State and the defendant, the waiver may be upheld.  The Texas Court of Criminal Appeals
distinguished Delaney from the
situation in Broadway:  Broadway hoped the trial court would grant
him deferred adjudication community supervision, and so waived his right to a
jury trial.[4]  The trial court found the State did not want
to acquiesce in this waiver of jury trial, and thus Broadway induced the States
consent with his plea of guilty.  The
State gave consideration (its consent to join in Broadways waiver of a jury
trial) and, hence, Broadways waiver of appeal was part of a bargain.  Broadway,
301 S.W.3d at 69798.  

            As
discussed above, we do not find that Shallhorn
stands for the proposition that a defendant entering an open plea of guilty
must specifically preserve the right to appeal the denial of a pretrial motion to
suppress.  See Tex. Code Crim. Proc.
Ann. art. 44.02.  The State also
cites Simpson v. State, 67 S.W.3d 327
(Tex. App.Texarkana 2001, no pet.), in support of its position.  In Simpson,
we held that Simpsons plea of guilty waived any claim of error in the trial
courts denial of the motion to suppress. 
This holding was based on our finding that the judgment of guilt was
based on Simpsons plea of guilty (to the offenses of aggravated robbery and
unauthorized use of a vehicle) and therefore was independent of any alleged
error in the suppression ruling.  As
stated earlier, a case such as Burtons, where the evidence sought to be
suppressed was drugs and other contraband, the judgment of guilt is not
independent of the trial courts ruling on the suppression motion.  Young,
8 S.W.3d at 667; Hargrove, 40 S.W.3d at
55859.  A defendant who enters an open
plea (i.e., pleads guilty, but not as the result of a plea bargain) may still
appeal written pretrial motions under Article 44.02.  See
Monreal, 99 S.W.3d at 620 (both
bargaining and non-bargaining defendants can appeal rulings on written,
pre-trial motions as well as jurisdictional issues).

            There
is no evidence in the record here that Burton waived his right to appeal.  The record shows that he entered an open plea
of guilty, preserved his challenge to the States evidence with a motion to
suppress evidence which was ruled on (although adversely to him) by the trial
court, and received permission from the trial court to appeal.[5]
 Accordingly, we find that Burton did not
waive his right to appeal.[6]  

The Suppression Hearing

            A
hearing was conducted on Burtons motion to suppress evidence.  In that hearing, Hunt County Sheriffs
Officer Larry Proctor testified that he received information about a possible drug
lab that was in the process of cooking methamphetamines at a residence at 601
Quail Run in West Tawokoni.  Proctor said
that another police officer told him about an informant who was then in custody,
but Proctor could not recall if he had ever worked with or met with this
informant prior to this occasion.  The
informant had been arrested a couple of hours prior to talking to Proctor, but
Proctor was unaware of the nature of the charge upon which the informant was
being held.  Proctor acknowledged he had
no information at the time the statement was made to him that it was worthy of
reliance.  When asked for any
corroborating information or anything to suggest the informants statement was
reliable, Proctor responded, Just the fact that he stated that he had assisted
in dropping off some of the items for the lab. . . . Some of the precursors.  Proctor said he did not know what precursors
had been dropped off, as Proctor did not have that information with him at
the hearing and Proctor did not indicate that the informant told him when these
precursors had been left at the site by the informant.  Although Proctor testified that he thought he
had made an audio visual recording of the informants statement, he was unsure
whether this had been done and there was neither an affidavit nor a written
statement by the informant mentioned or introduced.  

            After
speaking to the informant, Proctor gathered several other officers and went to
the location with the intention to go down there and see if I could observe
anything in that area.  This was
sometime between about 10:30 p.m. and midnight. 
At the location, Proctor said there was a strong northerly wind . . .
and you could smell a strong odor of ammonia coming from that location.  According to Proctor, there were twenty to
twenty-five houses on this particular street; the mother of one of the houses
occupants lived next door, and the next closest residence was about 200 yards
away.  Based on the smell of ammonia and
what he had been told by the informant, Proctor testified he believed exigent
circumstances existed.  Its a
hazardous situation.  Youve got open
flames.  Too much of it in one location
you can cause fires or explosions, things like that.  Proctor did not explain what open flames, if
any, he observed on the site before he entered the house.  After entering the house, he extinguished
some open flames, but he did not offer anything more specific and did not say
how, while still outside the house, he was aware that these open flames
existed.[7]  Based on these circumstances (an unidentified
informant, whose reliability was not then apparently known by Proctor, which
informant had claimed to have delivered unspecified precursors to the location,
and a strong smell of ammonia at the location), Proctor and the other officers
on the scene tried to make contact with occupants of the house.  Proctor testified that one person (not
identified in his testimony) was found in the yard; Proctor did not testify
what was done with this person.  At that
point, Proctor entered the residence and made contact with Burton, who was the
only person in the house.  Proctor
detained Burton, searched the house, extinguished the open flames, and called
for a HazMat[8]
team.  After he testified about detaining
Burton, clearing the house of hazards by extinguishing the open flames, and
calling for the HazMat team, Proctor testified as follows:

            A.        . . . I had to go back out to my vehicle
and get my breathing apparatuses and stuff to go back inside.

 

            Q.        [Prosecutor]  And can you describe to the Judge what stage
of the production of methamphetamine did you witness inside that home?

 

            A.        [Proctor]  Some of it was already complete.  Not a whole lot of it but some of it was but
they were still in the process of cooking.

 

            Q.        And after the HazMat Team arrived and
the premises was [sic] secured, were you able to go back in and retrieve
additional items or criminal instrumentalities used in the production of
methamphetamine?

 

            A.        Yes, we did. 

 

Exactly when Proctor saw evidence
in the house of a methamphetamine laboratory is not clear.  The above exchange suggests it was not until
after he had cleared the house, retrieved his breathing apparatus, then
re-entered the house that he observed the methamphetamine-making
operation.  Later, under
cross-examination, Proctor testified as follows: 

            Q.        [Defense Attorney]  The moment you smelled the ammonia or the
anhydrous, did you call HazMat immediately?

 

            A.        [Proctor]  It wasnt immediately, no.  We had to secure the area.  

 

            Q.        And that was after you entered the
residence.  Correct?

 

            A.        No, maam.  We started securing the area prior to
entering the residence.

 

            Q.        You called HazMat after you entered the
residence?  

 

            A.        Yes, maam.

 

            Q.        And you said they were in the process of
having - - or in the process of making the methamphetamine.  Correct?

 

            A.        Thats correct.

 

            Q.        At what
stage were they in the process?

 

            A.        About
half-way through.  

 

At no time did Proctor attempt to
secure a search warrant.  When he smelled
ammonia, he testified that he believed exigent circumstances existed and,
because of those exigent circumstances, he did not have sufficient time to seek
the issuance of a search warrant. 
Several items, including soaking or boiling fertilizer and some finished
methamphetamine, were subsequently found. 
Proctor also said that when he and the other officers arrived, neither
Burton nor anyone else was taking any actions suggesting the danger of the
destruction of evidence.  However,
Proctor testified that he believed that if the parties present would have noticed
us out there, they would have started destroying evidence.

Reviewing Trial Courts Ruling on Suppression

            We review a denial of a motion
to suppress for an abuse of discretion.  Shepherd v. State, 273 S.W.3d 681, 684
(Tex. Crim. App. 2008).  A trial courts
decision to grant or deny a motion to suppress evidence is reviewed under a
bifurcated standard of review.  Ford v. State, 158 S.W.3d 488, 493 (Tex.
Crim. App. 2005).  The general rule is
that an appellate court should afford almost total deference to a trial courts
determination of the historical facts supported by the record, especially when
the trial courts fact-findings are based on an evaluation of credibility and
demeanor.  Guzman v. State, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997).  At a suppression hearing, the trial court is
the exclusive trier of fact and the judge of the credibility of the witnesses. State v. Ross, 32 S.W.3d 853, 855 (Tex.
Crim. App. 2000).  We are also to afford
such deference to a trial courts ruling on application of law to fact
questions (also known as mixed questions of law and fact) if the resolution
of those questions turns on an evaluation of credibility and demeanor.  Guzman,
955 S.W.2d at 89.  On the other hand, we
review a trial courts rulings on mixed questions of law and fact de novo if
they do not turn on the credibility and demeanor of witnesses.  Johnson
v. State, 68 S.W.3d 644, 65253 (Tex. Crim. App. 2002).  We sustain the trial courts
ruling if it is reasonably supported by the record and correct on any theory of
law applicable to the case.  Laney v. State, 117 S.W.3d 854, 857
(Tex. Crim. App. 2003).  When a trial
court does not enter express findings of fact on the courts suppression
ruling, the reviewing court must view the evidence in the light most favorable
to the trial courts ruling and assume that the trial court made implicit
findings of fact which support its ruling so long as those findings are
supported by the record.  Valtierra v. State, 310 S.W.3d 442, 447
(Tex. Crim. App. 2010).  

Warrantless Search

            Proctors
search of Burtons residence was done without a warrant.  Once a defendant has made an initial showing
that a search or seizure was without a warrant, the burden of proof shifts to
the State to show the search was either in fact made with a warrant or that it
was a reasonable search.  Ford,
158 S.W.3d at 492.  Generally, the
Fourth Amendment to the United States Constitution prohibits the government and
its agents from searching the person or the property of individual citizens
without a search warrant.  McGee v. State, 105 S.W.3d 609, 615
(Tex. Crim. App. 2003); see U.S. Const. amend IV.  There are, however, exceptions to the Fourth
Amendments warrant requirement.  One
such exception arises when the governments representative (typically, a peace
officer) has accumulated sufficient facts that when those facts are considered
in the aggregate, the officer has probable cause to believe (1) that a crime is
being committed and (2) exigent circumstances justify searching without first
taking time to secure a search warrant from a neutral magistrate.  Estrada
v. State, 154 S.W.3d 604 (Tex. Crim. App. 2005); McNairy v. State, 835 S.W.2d 101, 106 (Tex. Crim. App. 1991).  The State claimed that exigent circumstances
existed here which justified Proctors warrantless entry and search.  Both probable cause and exigent circumstances
must be shown; otherwise, a warrantless entry will not survive Fourth Amendment
scrutiny.  Parker v. State, 206 S.W.3d 593, 597 (Tex. Crim. App. 2006).  However, facts known to officers are not to
be parsed into either a category of probable cause or exigent circumstances;
a reviewing court analyze[s] each piece of evidence as part of the totality of
information, as it relates to both the probable cause and the exigent
circumstances determinations.  Id. at 601.  

Probable Cause

            [P]robable
cause is the accumulation of facts which, when viewed in their totality, would
lead a reasonable officer to conclude, with a fair probability, that a crime
has been committed or is being committed by someone.  Id. at
599; see also Baldwin v. State, 278 S.W.3d 367, 371 (Tex. Crim. App. 2009) (probable
cause is a greater level of suspicion than reasonable suspicion and requires
information that is more substantial in quality or content and a greater
reliability with respect to the source of information; a relatively high
level of suspicion though less than the standard for preponderance of the
evidence).  Probable cause is a fluid
concept, analyzed in light of the totality of the circumstances and assessing
probabilities in light of the particular facts and circumstances present.  See
Dixon v. State, 206 S.W.3d 613, 616
(Tex. Crim. App. 2006).  Where some of
the information being considered for a determination of probable cause involves
an informants tip, the informants veracity and the basis of his knowledge are
relevant considerations in the totality-of-the-circumstances analysis that
traditionally has guided probable-cause determinations: a deficiency in one may
be compensated for . . . by a strong showing as to the other . . . .  Id.
(quoting Illinois v. Gates, 462 U.S.
213, 233 (1983)).

            The
trial court entered no findings of fact and conclusions of law in this case to
explain its denial of Burtons motion to suppress; we will view the evidence in
the light most favorable to the trial courts ruling and assume the trial court
made implicit findings of fact in support of the ruling as long as those
implicit findings are supported by the record. 
Woolverton v. State, 324
S.W.3d 794, 798 (Tex. App.Texarkana 2010, pet. refd) (citing Valtierra, 310 S.W.3d at 447).  Evidence of probable cause in this case
consists of Proctors testimony that an unidentified informant (whose
reliability was unknown to him) at the police station told Proctor the
informant had assisted in taking unnamed precursors at some unnamed time to a possible
lab going, together with Proctors testimony that at the location, he smelled
a strong odor of ammonia coming from the residence, which, based on his
training and experience, is used in the production of methamphetamine.  

            In
State v. Steelman, 93 S.W.3d 102, 104
(Tex. Crim. App. 2002), police officers received an anonymous tip that drug
dealing was taking place at the Steelman residence.  After looking through a window and observing
no illegal activity, they knocked on the door. 
Ian Steelman answered and came onto the porch, closing the door behind
him.  The officers detected the odor of
burnt marihuana emanating from the residence (but not on Ian himself or his
clothes); when Ian went back in to get his identification and tried to close
the door, officers prevented him from closing the door, entered, and arrested
all of the occupants.  Id. at 10405, 108 n.8.  The Texas Court of Criminal Appeals held that
the arrest and subsequent search were invalid, ruling that odors alone do not
authorize a warrantless search and seizure in a home.  Id. at
108.  It is significant that the Texas Court
of Criminal Appeals ruling in Steelman
centered on its finding that the smell of burning marihuana did not give the
officers probable cause to believe Ian had possessed marihuana in the officers
presence.[9]  An odor of marihuana may, though, be a factor
in a determination of probable cause that an offense has been or is being
committed.  Estrada, 154 S.W.3d at 609.

            In
McNairy, 835 S.W.2d at 103, 106,
police officers detected the strong smell of methamphetamine emanating from a
trailer house.  The officers had
extensive specific experience with methamphetamine laboratories.  As they approached the trailer house, the
officers heard individuals running from the residence into nearby brush.  As the officers looked through the doors of
the trailer house to see if anyone was present, they observed chemicals
associated with the manufacture of methamphetamine.  These discoveries were immediately preceded by
the officers finding a methamphetamine laboratory on another part of the same
ten-acre tract.  The court found probable
cause existed to justify entrance to the trailer.  Id. at
106.  Under the extant circumstances, the
Texas Court of Criminal Appeals also found that the officers could have
reasonably believed more suspects remained in the trailer who could have either
posed threats to the officers or destroyed evidence.  Relying on the possibility of the destruction
of evidence, the Texas Court of Criminal Appeals found exigent circumstances
existed which justified the officers warrantless entrance.  Id. at
107.  However, after the initial
warrantless entry (during which the officers saw stacks of items used to
produce methamphetamine), the officers did not search the trailer house until
they had first acquired a search warrant. 
Id. at 103.

            Closer
to the facts of the instant case are those of Pool v. State, 157 S.W.3d 36 (Tex. App.Waco 2004, no pet.).  In that case, the police received a tip of
suspicious activities at Pools house; the tipster reported several propane
tanks outside the house and told police that Pool was probably cooking
methamphetamine.  Id. at 39.  While talking
with Pool at the front door, they smelled a chemical.  Id.  Two officers also went around a fence and
into Pools back yard, where they detected a faint smell of anhydrous ammonia
and other items potentially used for manufacturing methamphetamine.  At this point, the officers left and applied
for and obtained a search warrant.  The
Waco Court of Appeals found there was no probable cause to justify the officers
entry to the back yard.  The informant
said Pool was probably cooking methamphetamine and the officer on the porch
only described smelling a chemical; an ammonia smell[10] was
not detected until officers entered the back yard.  Id. at
43.

            In
Pair v. State, 184 S.W.3d 329 (Tex.
App.Fort Worth 2006, no pet.), an officer at the front door of the suspected
location smelled what he believed to be ether, which he recognized as a smell
commonly associated with the manufacture of methamphetamine.  The officer thought he then heard movement
inside the house, possibly of people running or hiding.  The officer was in contact with another
officer, who had conducted surveillance of the residence after receiving
information that there was possibly a methamphetamine laboratory at the
location.  Id. at 334.  Another deputy
at the scene reported having seen a pitcher of white powder, which looked to be
either methamphetamine or methamphetamine by-products.  Id.
at 335.  The Fort Worth court found these
facts amounted to probable cause to support a warrantless entry.  Id.;
see also Effler v. State, 115 S.W.3d 696, 698700 (Tex. App.Eastland 2003,
pet. refd) (smell of odor officer associated with manufacture of
methamphetamine, in conjunction with officers knowledge and experience; sound
of people running inside house; and one persons opening door then quickly
running away amounted to probable cause to search).  The officers in Pair entered to assure that no evidence was being destroyed and no
one was injured in the house; they, however, made no search of the premises
until they acquired a search warrant.  Pair, 184 S.W.3d at 333.

            The
facts present in the instant case are somewhat less than those in the cases
cited above.[11]  Here, the searching officer had received a
tip that on the present record, was basically anonymous with no indication of
reliability, though the tipster had claimed to have, at some point in time,
assisted in delivering some unidentified precursors to the suspected
location.  A tip by an unnamed informant
of undisclosed reliability will rarely, when standing alone, establish the
requisite level of suspicion necessary to justify an investigative detention.  See Alabama v. White, 496 U.S. 325, 329
(1990).  There must be some further
indicia of reliability, some additional facts from which a police officer may
reasonably conclude that the tip is reliable and a detention is justified.  See id.  The informants veracity, reliability, and
basis of knowledge are highly relevant.  State v. Adkins, 829 S.W.2d 900, 901
(Tex. App.Fort Worth 1992, pet. refd). 
Thus, if a tip has a relatively low degree of reliability, more
information will be required to establish the requisite quantum of suspicion
than would be required if the tip were more reliable. White, 496 U.S. at 330. 
Proctor testified that he smelled a strong odor of ammonia coming from
the suspected residence and that he had experience and training through which
he knew ammonia is often used in the manufacture of methamphetamine.  After the informants tip, Proctor stated his
intention was to go down there and see if I could observe anything in that
area.[12]  He went down there with four units.[13]
 Although the State has not briefed this
issue, it appears that their argument would have to be that the smell of
ammonia tipped the scale of facts known to Proctor to the side of probable
cause.  We defer to the trial court on matters
of the credibility of the witness at the suppression hearing, and review the
finding of probable cause de novo.  

            The
police here only achieved minimal corroboration of the unnamed informants
statement to Proctor.  Reviewed in the
light most favorable to the trial courts ruling, Officer Proctors smelling a
strong odor of ammonia, combined with his experience that ammonia is often
present in the manufacture of methamphetamine, arguably provides some
corroboration of the informants statement that he had helped deliver
unspecified precursors to the residence at some point in time.  Corroboration by the law enforcement officer
of any information related by the informant may increase the reliability of the
information.  State v. Stolte, 991 S.W.2d 336, 341 (Tex. App.Fort Worth 1999,
no pet.). 

            Had
Proctor composed an affidavit describing his observances and submitted them to
a neutral magistrate, it is questionable whether he would have obtained a
search warrant based solely on the information he had.[14]  In Davis
v. State, 144 S.W.3d 192 (Tex. App.Fort Worth 2004, pet. refd), the
officers affidavit supporting the search warrant was found inadequate to
establish probable cause.  The officers
affidavit relied almost entirely on a confidential informant who had never
before provided information to police. 
The only evidence of reliability for the informant was that he had been
arrested six years previously for an undisclosed drug offense and was
supposedly familiar with the packaging and characteristics of marihuana.  Id.
at 198 (affidavit alleged Davis possessed and was growing marihuana).  The court of appeals also found fault with:  the officers verification of the informants
information, which failed to establish that the suspected individuals (named
Davis and identified by the officer through drivers license and automobile
registration data) were the same Davises to whom the informant referred, which
suffered from a lack of specificity in the delineation of criminal activity,
which was not independently corroborated or verified, and which lacked any
information in the affidavit pertaining to the means by which the informant
became privy to the information he provided. 
Id. at 199200.

            By
way of some contrast, an officers opinion that he smelled an odor he
associated with the production of methamphetamine was instrumental in a
probable cause determination in Davis v.
State, 202 S.W.3d 149 (Tex. Crim. App. 2006) (unrelated to above-cited Davis from the Fort Worth Court of
Appeals).  In Davis, officers secured a search warrant.  The Texas Court of Criminal Appeals agreed
with the States concession that the background information in the affidavit
was insufficient.  That background data
consisted of:  (1) information procured
from a confidential informant (whose history or reliability remained
unestablished) that Davis was making methamphetamine at the named location; (2)
a Crime Stoppers tip had been received reporting a chemical odor at the
residence and Davis was manufacturing methamphetamine at the residence; and (3)
information (from an undisclosed source) that Davis had purchased items such as
starter fluid and coffee filters, used in the production of
methamphetamine.  Id. at 152.  However, the
affidavit also included a report from another police officer which stated that
on a date and time certain, he drove by the suspected location and could smell
a strong chemical odor he has associated with the manufacture of
methamphetamine emitting from the residence. 
Id. at 153. 

            The
court of appeals had reversed the conviction, citing the affidavits failure to
adequately specify the basis for the belief of the officer who had detected
the odor that the odor he smelled was associated with the production of
methamphetamine.  Id. at 155.  The Texas Court
of Criminal Appeals, though, found it was not unreasonable to infer that when
a person identifies a smell by association, he has encountered that
odor-causing agent before.  Davis, 202 S.W.3d at 157.  Thus, the Texas Court of Criminal Appeals
found the trial court properly deferred to the magistrate who made the probable
cause determination and issued the warrant, and the trial court did not err in
denying the motion to suppress.

            Although
Davis involved a warrant, as we have
cited above, the probable cause determination for a warrantless search is virtually
the same as that employed in reviewing a warrant.  Also of note to Burtons appeal is the
following language in Davis:

The affiant in this case, properly relying on
facts supplied by another officer, asserted that on the day the affidavit was
prepared, an officer drove past the residence, identified it by address, and
smelled an odor that he has associated with the manufacture of methamphetamine.
 On these facts alone, without any
other information, the magistrate was authorized to issue the warrant as long
as the officer was qualified to recognize the odor.  That is the only relevant inquiry.

 

Id. at 156 (footnote omitted) (emphasis added).  The Texas Court of Criminal Appeals, as
discussed above, went on to find that the officer detecting the smell was,
indeed, qualified to recognize the odor, or at least that was a not
unreasonable inference to draw.[15]  

            Viewing
the record in the light most favorable to the trial courts ruling, we cannot
say that the trial court abused its discretion in finding probable cause for
the search.  Whether this Court would
have reached the same conclusion is immaterial. 
The trial court was within its discretion to find that in the totality
of the circumstances, there was evidence from which a reasonable officer could
conclude there existed a fair probability of finding evidence of a crime at the
location at issue.  

Exigent Circumstances

            Having
found the State demonstrated the officers had probable cause to believe
evidence of criminal activities were to be found in the residence, the record
still must support a finding that exigent circumstances existed which justified
a warrantless entrance onto the property. 
Exigent circumstances justifying a warrantless entry include:  (1) rendering aid or assistance to persons
whom the officers reasonably believe are in need of assistance; (2) preventing
destruction of evidence or contraband; and (3) protecting the officers from
persons whom they reasonably believe to be present and dangerous.  McNairy,
835 S.W.2d at 107 (situations creating exigent circumstances sufficient to
justify a warrantless entry usually include factors pointing to some danger to
the officer or victims, an increased likelihood of apprehending a suspect, or
the possible destruction of evidence). 
Relevant factors include:  (1) the
degree of urgency involved and the amount of time necessary to obtain a
warrant; (2) a reasonable belief that the contraband is about to be removed;
(3) the possibility of danger to police officers guarding the site of the
contraband while a search warrant is sought; (4) information indicating the
possessors of the contraband are aware that the police are on their trail; and
(5) the ready destructibility of the contraband and the knowledge that efforts
to dispose of narcotics and to escape are characteristic behaviors of persons
engaged in the narcotics traffic.  Id. at 107 (citing United States v. Rubin, 474 F.2d 262, 268 (3rd Cir. 1973)).

            We
alluded to some exigent circumstance caselaw in our analysis of probable
cause.  In McNairy, officers heard people running out of the trailer as
officers approached.  In Pair, officers thought they heard sounds
of people moving about inside the house.  In Effler,
police heard people moving around in the house, and the person who opened the
door ran quickly away.  These facts
entered into the respective courts consideration of whether exigent
circumstances justified warrantless entries. 
In each case, officers concerns over the possibility of destruction of
evidence or for officer safety amounted to exigent circumstances.

            Here,
however, there was no indication that Burton or the person found in the yard of
Burtons house were aware that officers were present until they appeared; there
was no evidence of people moving around as if to destroy evidence.  As pertains to safety of the officers,
Proctors concern was for some possible fires or explosions, things like that.  But we find the record insufficient to
justify his warrantless entry under the facts of this case.

            We
find it appropriate to discuss the exigencies needed to excuse a failure to
knock and announce the execution of a search warrant because the cases
establishing or applying the rules on these (Wilson, Richards, Ballard) speak in terms of concerns for
safety of the officers involved or about the possible destruction of evidence,
the same concerns described in McNairy
and its treatment of exigent circumstance situations.  The United States Supreme Court, in Richards, held that in order to justify
a no-knock entry, the police must have a reasonable suspicion that knocking
and announcing their presence, under the particular circumstances, would be
dangerous or futile, or that it would inhibit the effective investigation of
the crime by, for example, allowing the destruction of evidence.  Richards
v. Wisconsin, 520 U.S. 385, 394 (1997). 
We will use that reasonable suspicion, in conjunction with the factors
suggested in McNairy, to evaluate the
reasonableness of the officers actions in the instant case.

            In
Ballard v. State, 104 S.W.3d 372
(Tex. App.Beaumont 2003, pet. refd), the appellate court reviewed the officers
decision to dispense with the requirement to knock and announce their
intentions to execute a search warrant.[16]  The officers decided to enter the house
without the requisite knocking and announcing of their presence based on the
history of clandestine laboratories being maintained and defended by violent,
paranoid persons.  Id. at 37678.  The appellate
court found the officers testimony to be general and lacking in facts specific
to the house and the circumstances involved at the time of executing the warrant.
 Id.
at 37879 (citing Richards, 520
U.S. at 394).  The court of appeals also
pointed out the lack of specificity of the informants testimony about the
possibility that Ballard may have had a weapon and found the officers reliance
on this information misplaced.  Id. at 383.  The court found the State failed to carry its
burden of providing adequate evidence to justify its no-knock entrance into
Ballards house.  

            Proctor
testified he believed, once he smelled the strong odor of ammonia coming from
the direction of the suspect location, he was confronted with a hazardous
situation.  Youve got open flames.  Too much of it in one location you can cause
fires or explosions, things like that. 
He did not explain what open flames he witnessed before he had already
entered the house; later, when describing how he went into the house, he just
said he put out open flames in the house. 
Proctors stated basis for exigent circumstances was that he feared an
explosion or fire could occur, but his testimony to support that conclusion
appears inconsistent.  He first said that
open flames were present:  Youve got
open flames.  Too much of it [by which we
presume he meant ammonia] in one location, you can cause fires or explosions,
things like that.  There is no
explanation of what open flames were present when Proctor first came upon the
residence.  There is nothing to support
an inference that he saw an open flame from outside the house. 

            Regarding
McNairys factors[17] to
consider in reviewing law enforcements claim of exigent circumstances, we
observe that Proctor offered no testimony regarding the length of time he
expected it would take him to secure a search warrant.  He did say he had contact numbers available
to him for appropriate judges and it appears from the record that he discovered
the odor of ammonia shortly before midnight. 
There is nothing in the record to imply a reasonable belief the
contraband was about to be removed. 
Likewise, there is nothing indicating that Burton or anyone else
associated with the production of methamphetamine at the residence was aware
that they were the target of a police investigation.[18]  As for the possibility of danger to law
enforcement officers guarding the site if a search warrant were to be sought,
Proctors statement that the possibility of an explosion or fire conceivably
augur in support of this factor. 
Regarding the factor of the ready destructibility of the contraband and
the knowledge that efforts to dispose of narcotics and to escape are
characteristic behavior of persons engaged in the narcotics traffic,[19]
the only evidence in support of this was Proctors statement that the suspects
would have begun destroying evidence if made aware of the officers
presence.  Proctor also said
methamphetamine itselfnot the elements and implements used to manufacture itcould
easily be destroyed.  Proctor offered no
testimony as to how quickly other items could be destroyed.  For example, there were amounts of fertilizer
being soaked or boiled, a Coleman lantern, and other (presumably smaller) items
such as rock salt and pseudoephedrine.[20]  Considering the evidence with McNairys suggested factors, we find
there was evidence of some degree of urgency (first factor) and of some danger
to the officers and others in the immediate vicinity (third factor); but little
or no evidence, other than Proctors broad assertion that evidence could be
destroyed, that evidence could soon be removed or destroyed, or that suspects
knew that law enforcement officers were close by and investigating (second,
fourth, and fifth factors).  

            A
finding of exigent circumstances is a finding of fact which an appellate court
reviews only for clear error or an abuse of discretion.  Parker,
206 S.W.3d at 598 n.21 (citing United
States v. Coles, 437 F.3d 361, 366 (3d Cir. 2006)).  As stated above, Proctors testimony was not
entirely clear as to whether he saw evidence of the methamphetamine laboratory
on his first entrance into the house, when he cleared it, or on the second,
when he returned with a breathing apparatus. 
In McNairy and Pair, discussed above, although officers
initially entered the premises under exigent circumstances, they did not search
the buildings until after they had secured a search warrant.  

            Proctors
testimony did not amount to a reasonable suspicion that entrance without
securing a warrant was necessary either for the safety of the officers or the
public, or to prevent the destruction of evidence.  Finding there was insufficient facts to
support law enforcements exigent circumstance entry into Burtons residence,
we sustain the second point of error.  

Harm Analysis

            Because we have found the
warrantless search was not authorized by an appropriate exception to the
requirement of a warrant, the error here is constitutional.  We must reverse the conviction unless we
conclude beyond a reasonable doubt that the error made no contribution to
Burtons conviction or the punishment.  Tex. R. App. P. 44.2(a). In the instant
case, the complained-of evidence which Burton sought to suppress includes both
the methamphetamine with which Burton was charged to have possessed in this
case and the chemicals he was charged with possessing in the companion case.  A search that offends the Fourth Amendment
renders the subsequently discovered evidence inadmissible as a fruit of the
poisonous tree.  Segura v. United States, 468 U.S. 796, 804 (1984); see also Hernandez v. State, 60 S.W.3d 106 (Tex. Crim. App. 2001) (error
resulting from admission of evidence in violation of Fourth Amendment to be
reviewed under Rule 44.2(a)).  The
evidence should have been suppressed; as such, the error contributed to Burtons
conviction.  See McQuarters v. State,
58 S.W.3d 250, 258 (Tex. App.Fort Worth 2001, pet. refd); Corea v. State, 52 S.W.3d 311, 31718
(Tex. App.Houston [1st Dist.] 2001, pet. refd).  

            We reverse the judgment and remand
to the trial court for further proceedings.

 

                                                                        Bailey
C. Moseley

                                                                        Justice

 

Date Submitted:          March 15, 2011

Date Decided:             April 5, 2011

 

Publish











[1]A
second indictment charged Burton with possession or transport of certain
chemicals with intent to manufacture a controlled substance.  Tex.
Health & Safety Code Ann. § 481.124 (Vernon 2010).  He also pled guilty to that offense and was
sentenced to seven years incarceration (see cause number 06-10-00200-CR on the
docket of this Court).  Both cases were
addressed in one proceeding in the trial court and Burton has filed one
appellate brief attacking both convictions. 
Our resolution of Burtons points of error in this opinion likewise
address his complaints in the second conviction.    

 





[2]There
is no waiver of appeal in the record.  





[3]Delaney
entered a plea of guilty without a negotiated plea agreement in place, and
waived his rights to a jury trial and appeal. 
He was placed on deferred adjudication community supervision;
subsequently, he was adjudicated guilty, his supervision revoked, and he
received a life sentence.  The Texas
Court of Criminal Appeals found the waiver of appeal was not voluntary,
knowing, and intelligent because when the waiver was madeat the time of the
initial plea and before guilt was pronouncedDelaney could not know what his
punishment would be.  [S]imply knowing
the range of punishment for the offense is not enough to make the consequences
of a waiver known with certainty.  Delaney, 207 S.W.3d at 799.

 





[4]See Tex.
Code Crim. Proc. Ann. art. 1.13.





[5]See Tex.
R. App. P. 25.2. 

 





[6]Even
if, as the State urges, Burtons plea of guilty were taken to amount to a
waiver of appeal, it could not be said such waiver was made voluntarily or
knowingly, as Burtons punishment was yet to be determined and no bargaining
had occurred.  See Delaney, 207 S.W.3d at
799.





[7]Proctor
said after entering the house and detaining Burton, Proctor cleared the
residence for any hazards, for any open flames, which there was.  I had them put out and then I called for the
HazMat team.  

 





[8]Although
not specified in the testimony, we infer this means a team trained to deal with
hazardous materials.





[9]Steelman simply reiterated what
previously had been well established: 
the odor of marihuana emanating from a residence, by itself, is
insufficient to establish both the
probable cause and statutory
authority required for a warrantless arrest of a particular person
inside.  Parker, 206 S.W.3d at 598.





[10]Ammonia,
as noted by the Waco court, is a legal substance.  





[11]The
State has declined to address the merits of either of Burtons points of error.
 We find this appellate strategy,
trusting all its eggs of judgment and sentence on two felonies, in the basket
of a potentially ineffective procedural defense, questionable. 
 





[12]This
statement was made under cross-examination by Burtons attorney.  When counsel asked what actions he took to
get a search warrant, Proctor replied, I did not attempt to get a search
warrant . . . at that time because I had no probable cause at that point.  And with the exigent circumstances, if youve
got a lab going, the majority of the time, you dont have time to get a search
warrant.  Defense counsels objection
that this answer was nonresponsive was sustained, so we will not rely on
Proctors opinion as to whether he had probable cause at that point in our
analysis. 

 





[13]Which
we take to mean at least four other officers. 






[14]Probable-cause
determinations in warrantless search situations are made using the same
standard as in warrant cases.  Dixon, 206 S.W.3d at 616 n.6.





[15]The
Texas Court of Criminal Appeals did, though, go on to comment that the
affidavit in Davis was far from
exemplary and should not have been dependent on so many inferences and
common sense conclusions.  Davis, 202 S.W.3d at 157.





[16]See Richards,
520 U.S. 385; Wilson v. Arkansas, 514
U.S. 927 (1995).





[17](1)
degree of urgency involved and the amount of time necessary to obtain a
warrant; (2) reasonable belief that the contraband is about to be removed; (3)
the possibility of danger to police officers guarding the site of the
contraband while a search warrant is sought; (4) information indicating the
possessors of the contraband are aware that the police are on their trail; and
(5) the ready destructibility of the contraband.  McNairy,
835 S.W.2d at 107.

 





[18]It
is true Proctor said that if the suspected illicit chemists had been aware of
the officers presence, they would have begun destroying evidence, but there is
nothing in the record to suggest Burton or his partner knew law enforcement
agents were present.  Proctor said he had
his headlights on, but there is nothing in the record describing how close to
the residence he or the other officers drove or the layout of the neighborhood,
other than Proctors statements that twenty to twenty-five houses were on this
street; and after one neighboring house, the next closest residence was about
200 yards away.  

 





[19]Id.





[20]During
the hearing, references were made to pictures taken at the scene and a report
detailing seized items, but these were not part of the appellate record.  Proctor also referred to a generator, but
it is not clear if he meant a gasoline-run machine to generate electricity or
something else.